Bergan, J.
The New York City Bent 'Stabilization Law of 1969 (Local Laws, 1969, No. 16 of City of New York) has been *129 held invalid by the Appellate Division because, in the opinion of the court, it does not represent a valid exercise of the legislative authority of the city.*
The court was of opinion that the authority given to the Beal Estate Industry Stabilization Association, a private corporation, to play an effective part in public rent control administration under the statute, is an unconstitutional delegation of power and also exceeds the terms of the State statute under which the city undertook to enact the 1969 statute.
The court ruled that the differences between scope and form of rent regulation authorized by the 1969 statute and the continuing regulation of older housing accommodations (pre-1947) under the preexisting statutory scheme of 1962 deprived the parties affected by the 1969 statute of equal protection of the laws.
Bent control of housing accommodations completed before February, 1947 is in pursuance of title Y of chapter 51 of the Administrative Code, enacted by the city in 1962. This local law as amended vests in the Housing and Development Administration, a city agency, authority to administer rent control under title Y. It expressly limits rentals that may be charged, in the accommodations to which it applies, to 6% net annual return plus 2% annual depreciation.
It is administered, as it has been noted, by a public agency of the city. The validity of this statute and its method of control have been sustained (Plaza Mgt. Co. v. City Rent Agency, 25 N Y 2d 630; Matter of Hartley Holding Corp. v. Gabel, 13 N Y 2d 306).
The 1969 local law, here involved, known as the Bent Stabilization Law, added title YY to chapter 51 of the Administrative Code and undertook to provide rent control for housing accommodations completed between February 1, 1947 and March 10, 1969. Until the enactment of the 1969 statute, rental of housing accommodations becoming available during this 22-year period was uncontrolled.
The main difference between the Bent Stabilization Law of 1969 and its predecessor is that while the 1962 statute is adminis *130 tered entirely by a city agency, the 1969 law is administered in part by an association made up of apartment owners, but under close and detailed supervision and control of official city agencies.
A somewhat larger permissible return on investment is possible under the 1969 act. Consistently with guidelines required to be prescribed, increases over the May 31, 1968 rent may be allowed on renewed leases or new leases not exceeding 10% for a two-year lease or 15% for a three-year lease (Administrative Code, § YY 51-5.0, subd. d). Certain other kinds of vacancies result in smaller percentage increases (subd. e). These limitations continue until July 1, 1970. In vacancies occurring after that date, increases may be fixed by administrative action at levels other than those prescribed in the statute.
The association which is authorized by the act to play a part in rent control is precisely prescribed (§ YY 51-6.0) as a “ Real Estate Industry Stabilization Association ”. This group may be either a corporation or an association and shall have as members the owners of not less than 40% of the dwelling units affected by the 1969 statute. It shall be registered with the Housing and Development Administration, a city agency which was in existence before the enactment of the 1969 act.
But this city agency may accept an industry association for registration only if it is satisfied that certain preconditions have been met: (a) that membership in the association is open to any owner of a multiple dwelling covered by the act; (b) that the association has adopted a code covering related terms and conditions of occupancy which has been approved by the Housing and Development Administration; (c) that the association has established a Conciliation and Appeals Board, the members of which, however, are all to be appointed by the Mayor with the approval of the City Council; (d) that each member has agreed in writing to abide by the orders of the Conciliation and Appeals Board and by the code; and (e) that the association is of such a character that it can carry out the purposes of the statute.
The statute also establishes a Rent Guidelines Board of nine members, all appointed by the Mayor and paid by the city, no member of which may be a person who owns real estate covered by the statute or is an officer of a tenants’ organization (§ YY 51-5.0). Its function is to prescribe guidelines for rent increases *131 within the prescribed limits before July 1, 1970, and to review the problem of rent increases once annually and to establish different levels thereafter (subd. d).
Membership by owners of multiple dwellings in the Real Estate Industry Association is voluntary, but if an owner does not join an association the dwelling becomes subject to normal rent control under title Y of chapter 51, in which case the City Rent Agency shall establish the maximum rent on the basis of the rent charged May 31, 1968 (§ YY51-4.0, subds. a, b).
It is thus to be seen that members of the industry play a part closely interrelated with official agencies in rent control by mechanisms designed to protect both owners and tenants during the emergency. The over-all supervision of the regulatory process is vested in the Housing and Development Administration which is expressly authorized to enact rules and regulations for the implementation of the statute (§ YY 51-4.0, subd. c); to approve the code of an association (§ YY 51-6.0, subd. b, par. [2]), and to discipline an association (subd. d).
The members of an association must also adhere to the limitations on rent increases fixed, as it has been noted, by the Bent Guidelines Board, and the Conciliation and Appeals Board has the power to hear complaints by tenants against landlords and requests by landlords for hardship increases above fixed rentals. Although the association establishes this board as part of the condition of approval and provides the funds for its operation, the Mayor appoints the members of the board.
The main thrust of plaintiffs' attack on the statute is that this important role in rent control played by apartment owners in association is both ‘ ‘ an invalid delegation of legislative authority ” and “ an illegal delegation of powers Y With almost equal stress it is argued that the statute vests the "administration of controls on rents and evictions ” ia a group or unit other than a city agency, thus exceeding the delegation of power by the State to the city for the enactment of rent control legislation.
That members of a complex industry play a part in guiding government to a fair regulation of the industry is an obvious advantage as long as government keeps the ultimate controls in its own hands. The knowledge and experience of the industry may be of valuable assistance to administration.
*132 The co-operation of the industry is more likely when the industry plays a responsible part in the regulation itself than when it stands outside and takes the prescriptions of public authority when handed down, as the real estate industry does in the regulations under title Y.
The ultimate success, or even the utility of the statutory mechanism which brings an industry association into an active role of regulative responsibility, may be arguable one way or another. But fair latitude should be allowed by the court to the legislative body to generate new and imaginative mechanisms addressed to municipal problems. “Novelty is no argument against constitutionality ” (People ex rel. Durham Realty Corp. v. La Fetra, 230 N. Y. 429, 446).
Whatever delegation may be said to have come down to the Real Estate Industry Association described in this statute, closely circumscribed and regulated as this is, no one could seriously entertain a fear that government has yielded any real sovereign power. Certainly no “ legislative power ” has been passed on under any possible conception of that term.
In an affidavit filed with the court at Special Term by . Jason R. Nathan, the Administrator of the Housing and Development Administration, which pre-existed the 1969 statute and which continues to play an over-all supervisory role in city rent control, the underlying utility and the legal precedent for the role played by the industry under this statute is carefully developed.
He stated: ‘ ‘ The new rent Stabilization Law departs from the standard residential rent control system in which a government administrative agency enforces the law. Under the new law, each landlord of previously uncontrolled residential property has the option to place it under standard rent control, or under a real estate industry self-regulation organization which is permitted, within limits, to allow more and higher rent increases than under standard rent control. The self-regulation industry organization is modeled directly from provisions of the Security Act of 1934 (15 U. S. C., § 780-3) which authorized and directed organization of a security dealers association for self-regulation purposes.”
The similar Federal plan referred to (U. S. Code, tit. 15, § 780-3), by which the regulation of over-the-counter security dealers was left to an association of members of the industry, *133 was sustained in Johnson & Co. v. Securities & Exch. Comm. (198 F. 2d 690 [2d Cir., opn. by Frank, J.], cert. den. 344 U. S. 855).
In this opinion Judge Frank noted that “ In the light of the statutory provisions concerning (a) the Commission’s power, according to reasonably fixed statutory standards, to approve or disapprove of the association’s Rules, and (b) the Commission’s review of any disciplinary action, we see no merit in the contention that the Act unconstitutionally delegates power to the association ” (p. 695).
This is substantially the kind of official supervision by city agencies which overlooks the association in this present case. In the same direction are Nassau Securities Serv. v. Securities & Exch. Comm. (348 F. 2d 133, 136 [2d Cir.]); Sunshine Coal Co. v. Adkins (310 U. S. 381, 388, 399); Opp Cotton Mills v. Administrator (312 U. S. 126).
The right of any member aggrieved by action of an association to have review before the Conciliation and Appeals Board seems a sufficient answer to the suggestion that the city has yielded a type of judicial power to the association. A similar avenue of review was considered in Johnson & Co. v. Securities & Exch. Comm. (supra, p. 695). (Cf. Matter of Benedetto v. Kern, 167 Misc. 831, affd. 255 App. Div. 753, affd. 279 N. Y. 798.)
Reliance is placed by plaintiffs in support of their argument of invalid delegation of power on Matter of Fink v. Cole, (302 N. Y. 216). The powers there conferred on the Jockey Club and those considered in this case are sharply distinguishable. There was there vested in the private club what Judge Lewis described as “ essentially a sovereign power ” (p. 224) in the exercise of a broad discretion to issue licenses. The officers of the club were, as the opinion noted, not ‘ ‘ responsible to the State government ”. The dissimilarity in the cases is manifest.
Decision in Murtha v. Monaghan (4 N Y 2d 897) similarly involved licensing by a private association and was decided on the authority of Matter of Fink v. Cole (supra) (7 Misc 2d 568, affd. 5 A D 2d 695). The right of a private association to retain license fees for a private purpose, considered in Fox v. Mohawk & Hudson Riv. Humane Soc. (165 N. Y. 517), is without relevancy to the present controversy.
*134 Plaintiffs also attack the Conciliation and Appeals Board as not constituting a governmental agency, and in view of the powers granted to it it is argued there is a resulting unlawful delegation of powers.
Although the statute provides that an association may “ establish ” the board, the appointment of all its members is made by the Mayor, as it has been noted, and the association has no function in the appointment of the board, or even in recommending to the Mayor the names of industry members.
The word ‘ ‘ establish ’ ’, as used in this context, can only mean that by getting its organization under way, the association has taken the preliminary step by which the board will be called to function and thus may be appointed by the Mayor. It is true that the funds to pay the salaries of the board and the expenses of its office are provided by the association.
But it is not an uncommon practice for a regulated industry to provide the funds expended by a public agency in its regulation. This course is followed in the insurance industry (Insurance Law, § 32-a), in public utility regulation (Public Service Law, § 18-a), and in banking (Banking Law, § 17, subd. 3). The Federal Reserve banks follow a similar course in supporting the Board of Governors of the Federal Reserve system (U. S. Code, tit. 12, § 243) from funds which are in turn supplied by private commercial banks (id., §§ 282, 341-361). (See, also, Wickham v. Trapani, 26 A D 2d 216, and Charlotte, C. & A. R. R. Co. v. Gibbes, 142 U. S. 386, 394.)
Nor is the requirement of section YY 51-6.0, (subd. c, par. [12]) that the code to be adopted shall provide for the payment of dues by the members to underwrite the reasonable expense of administration and the actual adoption of the code by the Housing and Development Administration invalid delegations of the taxing power. If the association is itself a valid and a proper agency for the statutory purpose managed by the industry, it is reasonable that there be a fair distribution of its operating costs among its members (cf. W. H. H. Chamberlin, Inc. v. Andrews, 271 N. Y. 1, 14; Nicchia v. New York, 254 U. S. 228; Charlotte, C. & A. R. R. Co. v. Gibbes, supra). Nor is it an invalid delegation of the taxing power that the amount of the particular assessment of members of the association be left for it to determine (People v. Brooklyn Garden Apts., 283 N. Y. 373).
*135 It is suggested also by plaintiffs that the 1969 act violates specific statutory authority to the city to enact rent control legislation (Local Emergency Housing Rent Control Act [L. 1962, ch. 21, §1],§1 et seq.). The Appellate Division was of opinion that the language of section 4, authorizing the Mayor to establish or designate an official or unit ‘ ‘ of such city ” as a city housing agency, and the language at the end of section 2 that the policy ‘ ‘ now ’ ’ be administered locally by an agency ‘ ‘ of the city itself ’ ’, interdicted the plan of the 1969 local law integrating the industry association into the scheme of regulation.
It seems clear, however, that the term “ of the city itself ” was an expression of contrast in the implementation of the policy, between the State regulation which had theretofore been in effect and local control which was then being promoted.
The authority stated in section 5, if, indeed, in view of the general constitutional and statutory grant of local legislative power to the city, any further spelling out of authority for rent control was required, that the Mayor could “ designate ” an agency “ of such city ” as a city housing rent agency, was not a limitation on the power of the city to enact rent control legislation, but rather it dealt with an administrative power of the Mayor to designate a city agency to perform an additional function. There is thus no readily discernible limitation in any of the provisions of the Local Emergency Housing Rent Control Act on the legislative power of the City Council to enact title YY.
Finally, plaintiffs argue that the 1969 statute denies them equal protection of the laws because it discriminates against owners of pre-1947 housing units under title Y, who are subject to less favorable regulations; and also against those owners of housing units not previously controlled who do not wish to become members of an association and are thus left to the regulation of title Y.
The Appellate Division was of opinion that these differentials denied plaintiffs, who show ownership of both types of accommodations, of rights under the equal protection clause. Plaintiffs also argue, and the Appellate Division agreed, the rights of tenants are affected, but those rights are not within this litigation.
The question of equal protection turns ultimately on the similarity or dissimilarity of rights differentiated by a statute; *136 and the reasonableness of classification when different methods are used to affect different classes.
The prior statutory scheme of rent control under title Y had left post-1947 housing rentals uncontrolled. It was assumed in 1962 and for some time thereafter that as to that type of housing, the market, governed by supply and demand, would work reasonably and controls would be unnecessary. But by 1968 there was a rapid and radical change in the situation which created a serious housing crisis which the city felt obligated to meet.
The Nathan affidavit shows that commencing in the middle of 1968 a steadily growing volume of complaints were received by the city against increases in rent in the uncontrolled sector averaging 30%, and ranging as high as 60%, over pre-existing rents which were forcing large numbers of tenants to leave the city. Investigation disclosed that housing shortages had developed to the extent the vacancy rate had dropped from 3.19% in the spring of 1965 to 1.23% in the spring of 1968.
The affidavit develops in detail the events which led to the decision to impose rent control on the then uncontrolled sector of housing. It is clear that the differential in severity of control and the device of bringing the industry into a helpful role in regulation were both aimed at the “ ultimate solution to the housing shortage ’ ’ which was the encouragement of ‘ ‘ new construction ’ ’.
•It is helpful and instructive in understanding the rationality of differentials in the two concurrent methods of control .to understand the purpose of the mechanism in the 1969 statute as the city understood it when enacted. Mr. Nathan’s affidavit says this: “In the post 1947 housing, although the housing shortage and landlord profiteering urgently required measures to halt the rent spiral, there was simultaneously widespread fear that the imposition of rent controls might delay the ultimate solution to the housing shortage by discouraging some new construction. The compromise solution ultimately suggested by the Mayor and adopted by the New York City Council takes both factors into consideration. Thus the industry self-regulation pattern puts a brake upon run-away rent increases, but it does permit a great deal of freedom for landlords to increase rents within reasonable limits and thus to enjoy quite profitable opera *137 tions of their properties. This less onerous form of rent control was a conscious legislative choice in dealing with the problem of 400,000 heretofore uncontrolled housing accommodations. Moreover, this different form of rent control was adopted as a means of encouraging future construction of housing accommodations by allaying the fears of builders concerned about possible further extension of rent control to new construction. ’ ’
Whether Judges agree or not with the method of solution, it is not readily to be said that the differential in method of treatment of the long regulated pre-1947 housing and the newly regulated post-1947 housing has no rational basis.
It is enough to sustain the legislative power if the rationality of the classifications is demonstrable (Rankin v. Shanker, 23 N Y 2d 111, 114; Matter of Bauch v. City of New York, 21 N Y 2d 599, 607; Matter of Madole v. Barnes, 20 N Y 2d 169; Matter of Farrell v. Drew, 19 N Y 2d 486, 491; Metropolitan Co. v. Brownell, 294 U. S. 580; Tigner v. Texas, 310 U. S. 141, 147; Railway Express v. New York, 336 U. S. 106, 110; Patsone v. Pennsylvania, 232 U. S. 138, 144).
The difference in regulatory treatment between pre-1947 and post-1947 housing long antedated the 1969 statute and, as it has been noted, the 1962 act which continued the prior State control of pre-1947 accommodations, but left the later accommodations uncontrolled, has been sustained (Plaza Mgt. Co. v. City Rent Agency, supra; Matter of Hartley Holding Corp. v. Gabel, supra).
The 1969 statute, then, rested on a distinction in regulation already in existence. Although in 1969 the city could undoubtedly have extended the 1962 control statute to all post-1947 housing, or have continued the differential in treatment by not regulating post-1947 housing rentals at all, its decision to recognize the actual and existing distinctions between the two sectors by a difference in regulation has a rational basis (Metropolitan Co. v. Brownell, supra).
That it might, in fairness, give some recognition to the situation of owners who had undertaken by new construction to provide post-1947 housing with the belief, implicit in the public acts of the city before 1969, that such new accommodations would not be controlled, is one rational basis for the distinction manifest in the less onerous impact of the new statute.
*138 That the difference in treatment might tend to minimize the chilling effect on new construction after the 1969 act by leaving a more open horizon for future construction is another. A similar basis of statutory distinction in regulation avrs sustained in Pitts v. McGoldrick (302 N. Y. 938). It is conceded on all sides that new construction is the only ultimate solution to the housing shortage.
The order should be reversed, with costs, and declaratory judgment entered in favor of defendants.
Chief Judge Fuld and Judges Scileppi, Breitel, Jasen and Gibson concur with Judge Bergan ; Judge Burke dissents and votes to affirm on the opinion at the Appellate Division.
Order reversed, with costs, and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein.

 There is a similar local law as to stabilization of rents in hotels (Local Laws, 1969, No. 51 of City of New York) and a Metropolitan Hotel Industrial Stabilization Association which are not directly involved in the appeal.