In the Matter of WINDSOR PARK TENANTS' ASSOCIATION et al., Respondents, v NEW YORK CITY CONCILIATION AND APPEALS BOARD et al., Appellants.

Second Department, August 29, 1977

*Ellis S. Franke (William E. Rosen* of counsel), for New York City Conciliation and Appeals Board, appellant.

*McLaughlin & Fougner (Robert S. Fougner* of counsel), for Windsor Park Associates, appellant.

*Cammer & Karlsson (Kent Karlsson* of counsel), for respondents.

SHAPIRO, J. The New York City Conciliation and Appeals Board (CAB), granted the respondent landlord, Windsor Park Associates, a 6.31% building-wide comparative hardship rent increase under the New York City Rent Stabilization Law. In CPLR article 78 proceeding instituted by the petitioners (the tenants and their association) Special Term granted the petition to the extent of remanding the proceeding to the CAB "for the purpose of conducting a further hearing after an opportunity is afforded to the tenants to examine the books and records of the landlord upon which this application is based, said examination to be at the tenants' cost and expense." The landlord and CAB separately appeal from that determination. We affirm.

### THE QUESTION AT ISSUE

The CAB is a landlord-funded, mayoral-appointed body and we are here called upon to examine the procedures followed by it in reviewing applications by landlords for comparative hardship rent increases. Specifically, the question is whether the CAB, rather than relying primarily upon the landlord's financial statements certified only by landlord-retained certified public accountants, is required to make an independent audit of the books and records upon which the application is based or, in lieu thereof, must permit a tenant audit. The landlord appellant also asks us to determine that the CAB is a city housing rent agency and therefore has the automatic appeal and stay rights conferred by statute upon governmental agencies.

### I. THE GENESIS OF THE RENT STABILIZATION LAW

In 1962, pursuant to a State enabling act (L 1962, ch 21, eff Feb. 17, 1962), the City of New York enacted legislation placing its residential housing accommodations under city rent control (Administrative Code of City of New York, ch 51,

tit Y). However, the city's 1962 title Y residential rent control legislation expressly excluded from its rent control certain classes of housing accommodations. Among exempt classes were (generally) housing accommodations which were completed on or after February 1, 1947. Embraced in this major exclusion is the subject 20-building complex consisting of 1,828 units.

The 1962 enabling act provided that the regulation and control of residential rents and evictions within cities adopting local rent control legislation pursuant to the act shall be in a "city housing rent agency", which was to succeed to State rent control functions within the city (L 1962, ch 21, § 1, subds 4, 5, 6).

In 1969 the city enacted the Rent Stabilization Law (RSL) (Administrative Code, ch 51, tit YY). In 1970 the Court of Appeals, in *8200 Realty Corp. v Lindsay* (27 NY2d 124, app dsmd 400 US 962), upheld the constitutionality of the RSL. In comparing the differences in nature and administration between the city's 1962 title Y rent control statute and its 1969 title YY Rent Stabilization Law, as originally enacted,[1] the Court of Appeals noted (pp 129-134):

"Rent control of housing accommodations completed before February, 1947 is in pursuance of title Y of chapter 51 of the Administrative Code, enacted by the city in 1962. This local law as amended vests in the Housing and Development Administration, a city agency, authority to administer rent control under title Y. It expressly limits rentals that may be charged, in the accommodations to which it applies, to 6% net annual return plus 2% annual depreciation.

"It is administered, as it has been noted, by a public agency of the city. The validity of this statute and its method of control have been sustained *(Plaza Mgt. Co. v. City Rent Agency,* 25 N Y 2d 630; *Matter of Hartley Holding Corp. v Gabel,* 13 N Y 2d 306).

"The 1969 local law, here involved, known as the Rent Stabilization Law, added title YY to chapter 51 of the Adminsitrative Code and undertook to provide rent control for housing accommodations completed between February 1, 1947 and March 10, 1969. Until the enactment of the 1969 statute,

---

1. Both titles Y and YY have been amended in certain respects since the *8200 v Lindsay* analysis. The amendments shall be noted only where specially pertinent to the issues on the appeal.

rental of housing accommodations becoming available during this 22-year period was uncontrolled.

"The main difference between the Rent Stabilization Law of 1969 and its predecessor is that while the 1962 statute is administered entirely by a city agency, the 1969 law is administered in part by an association made up of apartment owners, but under close and detailed supervision and control of official city agencies.

"A somewhat larger permissible return on investment is possible under the 1969 act. Consistently with guidelines required to be prescribed, increases over the May 31, 1968 rent may be allowed on renewed leases or new leases not exceeding 10% for a two-year lease or 15% for a three-year lease (Administrative Code, § YY 51-5.0, subd. d). Certain other kinds of vacancies result in smaller percentage increases (subd. e). These limitations continue until July 1, 1970. In vacancies occurring after that date, increases may be fixed by administrative action at levels other than those prescribed in the statute.

"The association which is authorized by the act to play a part in rent control is precisely prescribed (§ YY 51-6.0) as a 'Real Estate Industry Stabilization Association'. This group may be either a corporation or an association and shall have as members the owners of not less than 40% of the dwelling units affected by the 1969 statute. It shall be registered with the Housing and Development Administration, a city agency which was in existence before the enactment of the 1969 act.

"But this city agency may accept an industry association for registration only if it is satisfied that certain preconditions have been met: (a) that membership in the association is open to any owner of a multiple dwelling covered by the act; (b) that the association has adopted a code covering related terms and conditions of occupancy which has been approved by the Housing and Development Administration; (c) that the association has established a Conciliation and Appeals Board, the members of which, however, are all to be appointed by the Mayor with the approval of the City Council; (d) that each member has agreed in writing to abide by the orders of the Conciliation and Appeals Board and by the code; and (e) that the association is of such a character that it can carry out the purposes of the statute.

"The statute also establishes a Rent Guidelines Board of nine members, all appointed by the Mayor and paid by the city, no

member of which may be a person who owns real estate covered by the statute or is an officer of a tenants' organization (§ YY 51-5.0). Its function is to prescribe guidelines for rent increases within the prescribed limits before July 1, 1970, and to review the problem of rent increases once annually and to establish different levels thereafter (subd. d).

"Membership by owners of multiple dwellings in the Real Estate Industry Association is voluntary, but if an owner does not join an association the dwelling becomes subject to normal rent control under title Y of chapter 51, in which case the City Rent Agency shall establish the maximum rent on the basis of the rent charged May 31, 1968 (§ YY 51-4.0, subds. a, b).

"It is thus to be seen that members of the industry play a part closely interrelated with official agencies in rent control by mechanisms designed to protect both owners and tenants during the emergency. The over-all supervision of the regulatory process is vested in the Housing and Development Administration which is expressly authorized to enact rules and regulations for the implementation of the statute (§ YY 51-4.0, subd. c); to approve the code of an association (§ YY 51-6.0, subd. b, par. [2]), and to discipline an association (subd. d).

"The members of an association must also adhere to the limitations on rent increases fixed, as it has been noted, by the Rent Guidelines Board, and the Conciliation and Appeals Board has the power to hear complaints by tenants against landlords and requests by landlords for hardship increases above fixed rentals. Although the association establishes this board as part of the condition of approval and provides the funds for its operation, the Mayor appoints the members of the board * * *

"The word 'establish', as used in this context, can only mean that by getting its organization under way, the association has taken the preliminary step by which the board will be called to function and thus may be appointed by the Mayor. It is true that the funds to pay the salaries of the board and the expenses of its office are provided by the association."

It should be noted that section 6 of chapter 576 of the Laws of 1974 amplified and augmented the authority of the CAB. Among the provisions of section 6 were the following:

"§ 6. a. The New York City conciliation and appeals board established pursuant to the provisions of section YY 51-6.0 of

the administrative code of the city of New York is hereby continued as a nine member board to be appointed by the mayor with the approval of the city council. Four members shall be representative of * * * owners, and one member shall be designated by the mayor to serve as the impartial chairman and shall hold no other public office * * *

"e. The board's powers shall include but shall not be limited to, the powers * * *

"(7) To accept any gifts or grants or loans of funds or property or financial or other aid in any form from the federal government or any agency or instrumentality thereof or from the state or the city or from any other source and to comply, subject to the provisions of this act, with the terms and conditions thereof".

## II. THE COMPARATIVE HARDSHIP APPLICATION

On or about April 1, 1969 the landlord appellant purchased the subject 20-building complex. It is a member of the Rent Stabilization Association. On February 21, 1975 it filed an application with the CAB pursuant to subdivision c of section YY 51-6.0 of the RSL and section 43 (subd [a] ["comparative hardship"]) of the Code of the Real Estate Industry Stabilization Association (Code). In its application it asserted that the level of fair rent increase was insufficient to enable the property to maintain approximately the same ratio between operating expenses and gross rents which prevailed on the average over the immediately preceding five-year period and that an additional increase in rent in the amount of 20.7714% was therefore warranted under the comparative hardship provisions of the Code.

The owner used as a current period the span of January 1, 1974 to December 31, 1974 and compared it with a five-year base period of 1969-1973, both inclusive.

Included in the application was the following certification by the owner's certified public accountants:

"We have examined Form CAB-3-M-43A.1 and attached schedules of Windsor Park Apartments Associates using the Current Annual Period January 1, 1974 to December 31, 1974. Our examination was made in accordance with *generally accepted* auditing standards and *included such tests and checks of the accounting records we considered necessary in*

*the circumstances,* giving effect to the specific instructions for the preparation of this form.

"In our opinion Form CAB-3-M-43A.1 presents fairly the ratio of Operating Expenses to Gross Rental Income in the amount of 76.7027% for the Current Annual Period for the purpose of Section 43A of the Rent Stabilization Code, giving effect to the specific instructions for determining such ratio." (Emphasis supplied.)

The "Six Year Comparative Financial Statements" submitted with the application and dated February 4, 1975 also contained the following certification by the landlord's certified public accountants"

"ACCOUNTANTS' REPORT

"To Windsor Park Apartments Associates (A Partnership)

"We have examined the accompanying balance sheets of Windsor Park Apartments Associates as at December 31, 1974, 1973, 1972, 1971, 1970 and 1969 and the related Statements of Income, Capital (Deficit) and Changes in Financial Position for the years then ended. As to 1969, our examination did not include the period January 1 through March 31. Our examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures *as we considered necessary* in the circumstances.

"In our opinion, subject to the outcome of the pending proceedings referred to in Note 5 of Notes to Financial Statements, the accompanying financial statements present fairly the financial position of Windsor Park Apartments Associates as at December 31, 1974, 1973, 1972, 1971, 1970 and 1969 and the results of its operations and changes in financial position for the period commencing April 1, 1969 through December 31, 1974, in conformity with generally accepted accounting principles applied on a consistent basis." (Emphasis supplied.)

Footnote 5 stated, in part: "A real estate tax review proceeding has been commenced by the Associates for the years 1969/70 through 1974/75. The outcome of this action and the ultimate amount of real estate tax refunds to be received cannot be reasonably estimated."

By execution of form CAB-5, dated March 26, 1974 and filed March 28, 1975, the owner certifed completion of service of notice to tenants. The certification stated: "This is to certify

that I have notified all Tenants whose interests may be affected by a determination of the CAB by mailing or delivering to them a copy *of this application and a copy of the answer form as prescribed by the CAB;* that a copy of this application and the operating statements or major capital improvement statement and all required schedules have been placed in the office of the superintendent or resident manager's office and is available for inspection by all affected Tenants. I have also set forth on the Owner's Application and Notice form (CAB-3-M), under Item 3- Notice to Tenants, the amount of the monthly percentage increased claimed by me." (Emphasis supplied.)

The notice contained in the landlord's application reads:

"3. NOTICE TO TENANT"

"The owner has filed an application for a rent adjustment on the ground indicated in item 10. If the Conciliation and Appeals Board approves the owner's application, the stabilized rents for the dwelling units in the property will be increased. THE OWNER'S APPLICATION CLAIMS AN INCREASE OF 20.7714% IN YOUR MONTHLY APARTMENT RENT. A copy of the owner's application is available for your inspection in either the Superintendent's or Resident Manager's office. *If you wish to interpose an answer to the owner's application you may do so, on the 'Tenant Answer Form' enclosed herewith,* within 10 days from the date of mailing of this notice." (Emphasis supplied.)

The answer form attached by the CAB to each notice served upon the tenants contained the following statement:

"NOTICE OF COMMENCEMENT OF PROCEEDING BEFORE THE CONCILATION AND APPEALS BOARD

"TO: THE TENANT

"The owner of your building is applying for the relief on the accompanying form. *Unless you submit information contrary to that contained in this Application, it may be assumed by the Conciliation and Appeals Board that the information supplied by your owner is correct. If any of the statements by the owner are incorrect, you should so advise the Conciliation and Appeals Board at once on this Answer Form.* The original of your answer together with one copy must be returned to this office within 10 days of the date of mailing appearing below." (Emphasis supplied.)

Thereafter, petitioner respondent Windsor Park Tenants'

Association requested and was granted extensions of time in which to answer the owner's application.

On July 1, 1975 the comparative hardship provisions of the Rent Stabilization Law were amended by chapters 392 and 549 of the Laws of 1975. As amended, the RSL provided the owner with relief in the form of a hardship rent increase if: "the level of fair rent increase is not sufficient to enable the owner to maintain approximately the same average annual net income (which shall be computed without regard to debt service, financing costs or management fees) for the three year period *ending on or within six months of the date of an application* pursuant to such criteria as compared with annual net income, which prevailed on the average over *the period nineteen hundred sixty-eight through nineteen hundred seventy,* or for the first three years of operation if the building was completed since nineteen hundred sixty-eight *or for the first three fiscal years after a transfer of title to a new owner provided the new owner can establish* to the satisfaction of the conciliation and appeals board that he acquired title to the building as a result of a bona fide sale of the entire building and that the new owner is unable to obtain requisite records for the fiscal years nineteen hundred sixty-eight through nineteen hundred seventy despite diligent efforts to obtain same from predecessors in title and further provided that the new owner can provide financial data covering a minimum of six years under this continuous and uninterrupted operation of the building to meet the three year to three year comparative test periods herein provided" (emphasis supplied).

Thus, chapters 392 and 549 changed the formula from a comparison of a one-year current period vis-à-vis a five-year base period to a comparison of a three-year current period to a three-year base period.

Chapter 392 of the Laws of 1975 made special provision for the application of the new formula to applications already pending by stating: "§ 2. This act shall take effect immediately but the provisions of this act shall not affect any right of a pending applicant under this title to the warranted increase computed pursuant to the law as amended by this act *effective one month after the date on which the owner originally completed his filing in accordance with the requirements of the conciliation and appeals board prior to the adoption of this act"* (emphasis supplied).

The provision of chapter 392 applying the new formula to

pending applications subsequently came under judicial review in *Matter of Vanderbilt 77th Assoc. v Conciliation & Appeals Bd.* (51 AD2d 946, mot for lv to app den 39 NY2d 707). In *Vanderbilt,* the First Department held (p 947): "Special Term seemed to construe the new law, section 2 of chapter 392, as not affecting pending applications. However, it is conceded and we find that it would by its terms apply to pending applications. Nonetheless, if, as petitioner contends, the CAB deliberately or negligently delayed processing the application before it as earlier submitted by this petitioner, then the petitioner is entitled to have its application processed under the previous law."

On or about January 8, 1976 the owner submitted an application, based upon the provisions of the amended law, alleging that it required a rent increase above standard guidelines in the amount of 8.49% to restore it to the base period net income level. In its application it used the three-year period April 1, 1969 through March 31, 1972 as its base period and the three-year period April 1, 1972 through March 31, 1975 as its current period.

Accompanying the application were letters from its agent stating that Windsor Park Apartments Associates had purchased the subject premises on March 31, 1969 *[sic]*; that with respect to the obligation to supply and file a schedule of vacancies, etc., it was not then and never had been the practice of the present owner to maintain a record of vacancies or collection losses, and that to require it to research six years of monthly statements to determine vacancy and collection losses would be inconsistent with established rental practices, and that the prior owner having been dissolved, it was not possible for it to supply records for the period prior to 1969. Financial statements certified by the landlord's accountants were also submitted in order that the entire new formula six-year span be covered under the landlord's submission.

By certification dated May 4, 1976 the owner advised the CAB that on May 1, 1976 it had completed additional service on the tenants in accordance with the new law.

Thereafter Windsor Park Tenants' Association filed a formal 21-page answer (dated May 19, 1976), which asserted that the owner's application was insufficient because it contained informational shortcomings, generalities and ambiguities. Accordingly, the tenants' answer was highlighted by an urgent request that their accountants and attorneys be allowed to

examine the books and records underlying the owner's application in order that the tenants might be enabled to intelligently and meaningfully comply with the following notice on the CAB tenant answer form: "Unless you [tenant] submit information contrary to that contained in this Application, it may be assumed by the Conciliation and Appeals Board that the information supplied by your owner is correct. If any of the statements by the owner are incorrect, you should so advise the Conciliation and Appeals Board at once on this Answer Form."

The landlord refused to permit any tenant examination of its books and records and the CAB similarly refused to permit tenant audit of those books and records. On June 28, 1976 the CAB conducted a hearing. The owners and tenants were represented by their respective attorneys and accountants. The following excerpts from the hearing officer's report are particularly pertinent and instructive to the issues on this appeal:

"The attorney for the tenants, Mr. Kent Karlsson, sought clarification of CAB procedures in these matters, asserting that the tenants had not had the opportunity to examine the information used by the owner in preparing his application. He further contended that he had not examined the Board's review of the owner's certified financial reports, and that he was incapable of contesting the data therein contained because that information requisite to such contest was not made available to him.

"The hearing officer for the Conciliation and Appeals Board and the accountant, Mr. Rosenblatt, pointed out that the owner's certified financial reports and certified profit and loss statements had been made available for review to the tenants' representatives, but that this Board does not permit direct review of the owner's books and records by the tenants' representatives. The attorney for the tenants entered a formal objection to this procedure arguing the impossibility of a valid contest to the owner's application if the information upon which said application was predicated was not made available to him * * *

"The attorney for the owner then entered a formal objection to the tenants being given any right to view the owner's books and records * * *

"The attorney for the tenants was then given the opportu-

nity to question the owner, his accountant and/or the Conciliation and Appeals Board accountant."

By letter to the CAB's chief accountant, dated July 6, 1976, the owner submitted further documentation, noting that "[a]t the June 28, 1976 hearing we agreed to submit certain added clarifying documentation". By letter dated July 12, 1976, the owner submitted still further "additional data and information".

By letter to the CAB's chief accountant, dated July 16, 1976, the attorney for the tenants' association pointed out, *inter alia:*

"First, as a general comment, I would like to note for the record that the material supplied does not satisfy the tenant association's request for the specific items originally requested both by the association, by myself, and by the accountants engaged by the association. Nor does this material satisfy our request for a private inspection of the books and records, or at least an inspection of all documents which was made available to the CAB, as testified to by Mr. Edwin Zarkin, the accountant who was given said books and records for purposes of inspection * * *

"Therefore, with respect to the tax reduction information, as well as to all the other supplemental information that has been filed after the application date, that such supplemental filings have extended the retroactive date of the application, to make the application 'complete' only as of the date of the filing of the supplemental information. In other words, we contend that these late filings, which should properly have been filed at the time of either the original or supplemental applications, have caused the landlord to fail to file a complete application until such time (without admitting that the application is now complete), and that therefore any retroactive order, if issued, in the nature of an increase, should be retroactive to thirty (30) days after the completed filing of all information, which, as it now stands, is June 12, 1976."

### THE CAB'S DECISION

The decision rendered by the CAB on September 30, 1976, in pertinent part, reads:

"Accordingly, the Board grants the owner a 6.31 per cent increase in rent building-wide.

"Section 2 of Chapter 392 of the Laws of 1975 provides, for

applications pending when the comparative hardship provision was amended by State Statute, that the increase under the new formula would take effect as of the same date the owner's original application would have taken effect. In this case, such effective date is April 27, 1975 one month after the owner completed its orginial filing; and therefore April 27, 1975 is the effective date of this increase. Pursuant to the August 24, 1972 amendment to Section 43(a) of the Code, however, the owner may not collect more than 6 per cent of said increase in the first year * * *

"The balance of the hardship increase, .31% takes effect as of April 27, 1976 * * * one year after the effective date of this order".

The CAB further held: "The Board finds no merit to the tenants' demand for audit of the owner's books and records by its own accountants. (Jaffin v Weaver, 3 AD2d 196, 159 NYS2d 37 [1957].) The tenants' attorney was afforded full opportunity to examine the owner's accountant as to books and records and methods of auditing at a hearing attended by both sides and fully availed himself of said opportunity over the course of several hours. Moreover, it is noted that the financial statements submitted by the owner in support of its application were certified to by an independent Certified Public Accountant."

In the ensuing article 78 proceeding instituted by the tenants and their association, it became crystal clear that the landlord's books were never audited by the CAB.

### THE DECISION AT SPECIAL TERM

As we have noted, Special Term's decision remanded the matter to the CAB "to conduct a further hearing after an opportunity is afforded to the tenants to examine the books and records of the landlord upon which the application is based. Said examination shall be at the tenants' cost and expense."

In support of its determination Special Term stated: "It is patent from the record that the CAB did not audit the books and records of the landlord. It appears that the Board rejected the word 'audit' and insisted on the word 'review'. A sharp variance exists between a review and an audit * * * At most, the accountant for the CAB made a cursory and superficial examination as to those items which were specifically called to

his attention. In the form distributed by the CAB to the tenants, the following advice was furnished: 'Unless you submit information contrary to that contained in this application, it may be assumed by the Conciliation and Appeals Board that the information supplied by your owner is correct.' This advice to the tenants, absent an opportunity to examine the books and records upon which the application is based, is merely perfunctory and a meaningless attempt to comply with *due process* * * * From the record it is clear that the CAB did not use any systematic process or any established criteria for its review of the landlord's application. In reaching this determination the court is aware that *the CAB is not a governmental agency with its inherent safeguards for the protection of the consumer. The CAB is an organization whose membership is limited to landlords.* The court raises no inference as to the integrity of the Board. Nevertheless, this fact calls for closer scrutiny, lest the feeling prevail that there is an aura of partiality." (Emphasis supplied.)

Special Term also stated:

"The tenants involved herein stand in a position of losing valuable *property rights* by any determination which may be reached as a result of said hearing.

"In judicial hearings the courts of our State have adopted rules permitting an almost unlimited right to full inspection and disclosure. The courts have consistently held that such procedures are required in the best interests of justice. The court sees no rational reason why the same rules of disclosure should not be applicable to an administrative hearing which affects the *property* rights of tenants. * * * The landlords are certainly entitled to a fair return as contemplated by the Legislature, but it should be achieved only after *due process* and a strict adherence to the fundamental principles of equity as guaranteed by our Constitution." (Emphasis supplied.)

### III. SHOULD AN AUDIT BY THE CAB BE REQUIRED OR ONE BY THE TENANTS BE PERMITTED?

On this appeal the owner and the CAB argue that the opinion of Special Term was premised on the misconception that a controlled or stabilized tenant has a constitutional, vested property right against an increase in his statutorily established rent. We agree that Special Term was in error in that regard since a rent stabilized tenant has no constitutional, vested property right against an increase in his stabi-

lized rent (see *Wasservogel v Meyerowitz,* 300 NY 125; *Bedford Bldg. Co. v Beame,* 38 NY2d 729, remittitur amd 39 NY2d 744). However, the mayoral-appointed, owner-funded CAB has been empowered by the City of New York to act upon applications by owners for hardship rent increases. Accordingly, it must conduct a *meaningful* review of owner applications and not subdelegate its truth-ascertainment duties and functions to the tenants by means of a notice that "[u]nless you submit information contrary to that contained in this Application, it may be assumed by the Conciliation and Appeals Board that the information supplied by your owner is correct" and that "[i]f any of the statements by the owner are incorrect, you should advise the Conciliation and Appeals Board at once on this Answer Form", while simultaneously refusing the tenants the basic means by way of an audit to ascertain whether the information supplied by the owner is correct.

That an audit of the books and records underlying an owner's application is vital and that the audit should be done by someone other than owner-retained accountants (particularly where they themselves have made entries in the owner's books and decide what audit tests and checks "we considered necessary") is an inherent requirement of fair dealing. The cases relied on to establish a contrary view do not in fact do so, for in each of them a tenants' audit was denied because the governmental rent control agency involved had itself done a thorough audit. Thus, in *Matter of Granville v Ross* (274 App Div 491, 493), the First Department noted that the Temporary City Housing Rent Commission's accountants had "examined the hotel books and made a field audit, checking the figures and data for accuracy" and the "commission made available for inspection by the tenants * * * statements taken from the books of the hotel's account".

In *Matter of Stark v McGoldrick* (135 NYS2d 398, 399), Special Term, in rejecting tenants' complaint that they had been denied the right to make an independent audit of the landlord's books, noted that the State Rent Administrator asserted that he had made "a thorough audit of the landlord's books".

In *Matter of Feig v McGoldrick* (206 Misc 1050, 1053, app dsmd 284 App Div 879), Special Term noted that the State Rent Administrator had made a "comprehensive audit".

In *Matter of Jaffin v Weaver* (3 AD2d 196, cited in the CAB

decision herein, the First Department noted that the State Rent Administrator had audited the landlord's books and records (fuel charges, for example, were verified by checks and receipted bills) and that, accordingly, there was no basis for permitting the tenants to make their own audit.

In *Matter of Koval v Herman* (193 NYS2d 839, 841), Special Term, in dismissing the landlord's article 78 complaint that the State Rent Administrator had not increased rents enough, noted that that official had conducted a "meticulous audit".

At bar, it is clear from the return, the article 78 papers and the CAB brief that the CAB had merely conducted a "review" (not an "audit") to determine that the landlord's papers were, in form, complete for service upon the tenants and that it conducted no further review of the landlord's papers except to the extent that there was a further "review" triggered by the objections the tenants were able to raise without an audit. The city having delegated to the CAB reviews of landlord applications for rent stabilization comparative hardship increases (see *8200 Realty Corp. v Lindsay,* 27 NY2d 124, *supra),* the CAB could not, in effect, subdelegate *its* obligation to conduct a meaningful and truth-seeking review to the *tenants,* while simultaneously depriving them of the vital audit tool which official governmental rent control agencies in this State had long deemed necessary for proper determination of the truth of an owner's application. Accordingly, we find no merit to appellants' contention that in its procedures the CAB acted in a rational manner and that Special Term improperly substituted its judgment for that of the CAB.

With respect to alleged reliance by other governmental agencies or private institutions upon certifications by the applicant's certified public accountants, we find that the cases and practices cited by appellants—such as those involving Mitchell-Lama housing (see, e.g., *Matter of Greene v Goodwin,* 46 AD2d 69, affd 36 NY2d 886) are not apposite. The hardship application at bar involves private housing and a review of six past years and no *projected* years. Furthermore the books and records here and the landlord's accountants had not been subject to any prior on-going control, certification, supervision or accounting standards imposed by the control agency (here the CAB) to which the owner's application was presented, whereas, in *Greene,* as our opinion shows, the "commissioner submitted to the Special Term the detailed study made by her

office of the project's yearly income and operating costs since 1972" (46 AD2d 69, 73, *supra).*

We conclude that under the circumstances of this case (particularly the objections raised by the tenants in their formal 21-page answer) an audit should have been conducted by the owner-funded CAB or, in the absence of a CAB audit, a tenant audit should have been permitted, under appropriate safeguards and restrictions to preclude dilatory or harassing tactics.[2]

### IV. PROBLEMS OF BASE PERIOD, CURRENT PERIOD AND RETROACTIVITY

It is undoubted that the selection of the base period and current periods may be of considerable significance in passing upon a landlord's application for an increase in rent. For example, it might well be to an owner's interest to juxtapose the highest possible base period against the lowest possible current period. In this connection the RSL (as amended) mandates that, with certain exceptions, the base period be 1968-1970. At bar, although the owner did not take title until April 1, 1969 and allegedly had difficulty locating pretitle books and records, the tenants claim that the owner did not furnish an adequate evidentiary basis for using a *base* period of April 1, 1969 through March 31, 1972 rather than the years 1968-1970.

The owner used a current period of April 1, 1972 through March 31, 1975. Its amended-law application was still being supplemented up to mid-1976. The July 1, 1975 amendments to the RSL (L 1975, ch 392) required that the current period end "on or within six months of the date of * * * application". Here the current period ended on March 31, 1975—more than six months prior to May 1, 1976. Thus the tenants assert that the current period selected by the owner and accepted by the CAB did not comply with the statute.

The tenants argue further that, at best, the landlord's application was not actually complete until June, 1976 and for that reason that it was error for the CAB to treat the owner's application as if it had been complete when initially filed early in 1975—prior to the July, 1975 amendments—and to

---

2. Upon oral argument counsel for the tenants represented that their accountants' audit of the landlord's books could be completed within 15 days. They should be held to that representation by Special Term.

rule that the increase's "effective date is April 27, 1975 one month after the owner completed its original filing".

We believe, however, that the CAB's handling of the questions of base period, current period and retroactivity was consistent with the RSL (see L 1975, ch 392, § 2), was rational, and on the evidence presented is entitled to controlling weight because made by the agency interpreting and administering the RSL (see *Matter of Hotel Assn. of New York City v Weaver*, 3 NY2d 206; cf. *Matter of Vaderbilt 77th Assoc. v Conciliation & Appeals Bd.*, 51 AD2d 946, mot for lv to app den 39 NY2d 707, *supra)*. However, since the CAB's determination was not preceded by an independent audit, either by itself or by one permitted the tenants, which we find to be warranted, the remand ordered by Special Term was proper.

### V. THE CAB AND THE AUTOMATIC APPEAL AND STAY RIGHTS CONFERRED BY STATUTE ON THE CITY HOUSING RENT AGENCY

On January 6, 1977 this court entered an order which: (1) granted the owner leave to appeal from the subject judgment; (2) on the court's own motion, granted the CAB leave to appeal from that judgment; and (3) granted the owner a stay to the extent of permitting it to collect in escrow the increase in rents beginning with the January, 1977 payments.[3]

On that motion the CAB submitted an affidavit asserting that the CAB "was created as an arm of the New York City government" and has the automatic appeal and stay rights of a city housing rent agency. The CAB affidavit further noted: "Moreover, when the State enacted Chapter 576, Laws of 1974 which terminated vacancy decontrol and placed dwelling units previously decontrolled from the City Rent Control Law and the Rent Stabilization Law, it specifically acknowledged the New York City Conciliation and Appeals Board as the agency to administer and enforce the '* * * regulation of residential rents as provided in the rent stabilization law of nineteen hundred sixty-nine and the emergency tenant protection act of nineteen seventy four' (Section 6, subdivision f of Chapter 576, Laws of 1974). Section 6 of Chapter 576 also directly modified and clarified provisions of the Rent Stabilization Law relating to the New York City Conciliation and Appeals Board, but again underlined the public nature of the Board by specifying

---

3. That escrow arrangement is directed to be continued for future rents pending the final determination of the issues in the proceeding.

that its members are '* * * to be appointed by the mayor with the approval of the city council'."

On this appeal the owner now asserts that "implicitly this Court therefore determined that the CAB is not with the procedural judicial review benefits of the Enabling Act; that accordingly the annulment of a CAB order unlike the annulment of an Office of Rent Control order is not accorded an automatic stay; that the CAB unlike the Office of Rent Control does not have an appeal as of right from an order of remand by Special Term that accordingly the filing of a notice of appeal by the CAB unlike a notice of appeal filed by the Office of Rent Control does not stay the order of Special Term pursuant to Section 5519 CPLR."

Accordingly, the owner requests us to reconsider and review that implicit determination and to now hold:

"[t]hat pursuant to the provisions of said Enabling Act as applied to the RSL, and the CAB by the Court of Appeals in *8200 Realty Corp. v Lindsay,* 27 NY2d 124, (a) the CAB is a City Housing Rent Agency established pursuant to said Enabling Act and had an appeal as of right from an order or judgment annulling its determination or remanding the same to the CAB for further consideration.

"(b) That any order or judgment annulling or remanding an order of the CAB is stayed for 30 days pursusant to the provisions of said Enabling Act.

"(c) That upon the filing of a notice of appeal by the CAB the order or judgment appealed from is stayed pending the hearing and determination of the appeal in the same manner as in proceedings involving the Office of Rent Control."

Among the appeal rights of a city housing rent agency are the following: (a) Such an agency may appeal as of right from an order remitting the proceedings for further consideration.

The enabling act (Local Emergency Housing Rent Control Act, § 8) prescribes as follows: "Notwithstanding any provision of section thirteen hundred four of the civil practice act to the contrary, any order of the court remitting the proceeding to the city housing rent agency may, at the election of the city housing rent agency, be subject to review by the appellate division of the supreme court and the court of appeals in the same manner and form and with the same effect as provided in the civil practice act for appeals from a final order in a special proceeding."

(b) Any order or judgment annulling or remanding an order of such an agency is stayed for 30 days from the date of its entry.

Section 8 of the Local Emergency Housing Rent Control Act further provides: "The effectiveness of an order of the court enjoining or setting aside, in whole or in part, any such regulation or order shall be postponed until the expiration of thirty days from the entry thereof."

(c) The filing of a notice of appeal by such an agency stays the effectiveness of an order or judgment annulling a determination of any such agency pursuant to CPLR 5519.

Section 8 further provides as follows: "The jurisdiction of the supreme court shall be exclusive and its order dismissing the petition or enjoining or setting aside such regulation or order, in whole or in part, shall be final, subject to review by the appellate division of the supreme court and the court of appeals in the same manner and form and with the same effect as provided in the civil practice act for appeals from a final order in a special proceeding."

The effect of the filing of a notice of appeal by a City Housing Rent Agency is to bring that agency within the purview of CPLR 5519, which provides, in pertinent part:

"5519 Stay of enforcement.

"(a) Stay without court order. Service upon the adverse party of a notice of appeal or an affidavit of intention to move for permission to appeal stays all proceedings to enforce the judgment or order appealed from pending the appeal or determination on the motion for permission to appeal where:

"1. the appellant or moving party is the state or any political subdivision of the state or any officer or agency of the state or of any political subdivision of the state".

To clarify any possible doubt created by our order of January 6, 1977, we now hold that for the purposes of appeal the CAB is and has the same rights and privileges (enumerated above) as a "city housing rent agency". We are fortified in our conclusion in this report by the analysis in *8200 Realty Corp. v Lindsay* (27 NY2d 124, *supra)* of the genesis, nature and function of the CAB.

The judgment should be affirmed.

### APPENDIX

The tenants' article 78 affidavits contain the following aver-

ments, uncontradicted by any counteraffidavit from the CAB, which relied on its answer (i.e., its pleading) and the return:

(1) From the article 78 affirmation of tenants' attorney, Kent Karlsson (he had attended the hearing): "The situation herein, however, is totally different, since at the hearing permitted herein the *staff accountant of the CAB admitted that no audit would be performed, and that it had not performed any such audit. The specific word 'audit' was rejected, and the word 'review' was substituted by the accountants and the chief accountant of the CAB at the hearing.* In fact, tenants contend that the sole items even 'reviewed' by the CAB accountant in this case, were only some of the items raised by tenant, but that no independent 'review' was made by the CAB staff with regard to any other matters." (Emphasis supplied.)

Mr. Karlsson alleged: "Although timely and properly demanded and although tenant offered to absorb the expenses relating to said audit, *the CAB declined to permit such an audit, notwithstanding the fact that it never performed its own audit with regard to landlord's application.*" (Emphasis supplied.)

(2) From the article 78 affidavit of tenants' accountant, C.P.A. Donald Wilen [he had attended the hearing]:

"The CAB accounting staff never in fact audited the books and records of the landlord. During the hearing, Mr. Rosenblatt, the Chief Accountant of the CAB specifically rejected the term 'audit' correcting Mr. Zarkin, his Deputy, and insisted on the word 'review.' We now find the word 'audit' back in the [CAB] Opinion, no doubt to give the accounting staff's 'review' more import. Indeed, Addendum #1 of the Opinion is entitled 'Accounting *Review*' [Emphasis added].

"Why should we be concerned over which word to use? Why did Mr. Rosenblatt correct Mr. Zarkin and insist that the CAB was not conducting an audit?

"The American Accounting Association defines auditing as: '* * * a systematic process of objectively obtaining and evaluating evidence regarding assertions about economic actions and events to ascertain the degree of correspondence between those assertions and established criteria and communicating the result to interested users.' *Jseph A. Silvoso [sic]*, et al., 'Report of the Committee on Basic Auditing Concepts,' Supplement to Vol. 47 of the *Accounting Review,* 1972, p. 18."

"Did the audit staff audit *one* check or receipted bill? Did they produce a procedure manual? Not at all.

"They protested at the hearing that they do not do an 'audit.' They 'review' self-serving documents submitted by landlords".

Wilen's affidavit contains a detailed, documented and pungent attack upon the CAB's reliance upon the certified financial statements submitted by the owner:

"The CAB invokes the words 'certified financial statements' as if, in some magical way, these words mean that the landlord's financial statements represent the definitive numbers attributable to its operations for the periods under review. This cannot be further from the truth.

"The accounting profession, many years ago, defined accounting as '* * * the act of recording, classifying, and summarizing in a significant manner and in terms of money transactions and events which are, in part at least, of a financial character and interpreting the results thereof.' *Accounting Terminology Bulletin #1,* American Institute of Certified Public Accountants, New York, 1953, p. 9.

"More recently, Marshall S. Armstrong, Chairman of the Financial Accounting Standards Board, the private sector's top authority on accounting, was quoted in the New York Times as saying that there is no consensus within the profession on fundamental objectives or concepts of financial reporting. 'Accounting is not a science based on natural laws,' he maintained. Armstrong, Marshall S., as quoted in 'Accounting Board Assails Criticism of its Rule-Making', *New York Times,* October 21, 1976, p. 55, 59."

Wilen's affidavit also casts a shadow upon the independence of the accountants certifying the landlord's financial statements:

"It is submitted that while there is no evidence whatsoever that the accountants for the landlord violated in any way generally accepted auditing standards, the statements should not be relied upon not only for the foregoing reasons, but also because the CPA firm was not in fact, independent. During the hearing the accountants for the landlord testified that they prepare the landlord's financial statements and post the general ledger. The Code of Professional Ethics of the American Institute of CPA's finds that such services do not impair independence as long as the CPA does not have any conflict-

ing relationship with the client, accept responsibility for the statements, assume an employee role, stray from generally accepted auditing standards. 'Code of Professional Ethics', American Institute of Certified Public Accountants, New York 1972, pp. 33-34.

"This rule would be reasonable in light of APB Statement No. 4 discussed, supra, wherein the users of the financial statements are defined narrowly. But what happens when the user is in an adversary position to the Accountant's client, such as a potential investor or, in our case, a tenant? It is submitted that such persons are entitled to a completely different standard of independence. Ideally, we need government audits such as the kind described by the by the *Jaffin* court *[Matter of Jaffin v Weaver,* 3 AD2d 196]."

HAWKINS, J. (concurring). I concur in the majority's conclusion to affirm.

In my view, Special Term properly confined its reasoning to the quintessential issue: are the respondent tenants to be accorded a reasonable opportunity, and at their own expense, to have their own accountants and attorneys examine the appellant landlord's books and records. There would then follow a further hearing by the Conciliation and Appeals Board (CAB), a coappellant, a creature of the Rent Stabilization Law.

Having affirmed the determination that the tenants of this vast apartment house complex are entitled to an opportunity to examine the data submitted to the CAB, I believe it unnecessary, at this juncture, to make findings and conclusions such as whether the tenants have a constitutional or vested property right to question the rent increases awarded, which base years are properly considered, etc. To discuss such details as which base year is applicable, I repeat, is not necessary at this time for, if the tenants' examination reveals significant miscalculations or extrapolations, I should assume that the CAB would accordingly either deny or adjust the rent increases.

I also see no present need to consider the constitutionality of various facets of this most recent rent control legislation. My reading of *8200 Realty Corp. v Lindsay* (27 NY2d 124 app dsmd 400 US 962) is that it holds there was no unlawful delegation of legislative powers to the Real Estate Industry Stabilization Association (REA) since the right of an aggrieved

member, i.e., a landlord, for a review before the CAB establishes that the REA has not been given "judicial powers". Surely such an intramural appeal within the confines of the CAB presupposes an independent audit or review—or, in any event, a real rather than a nominal consideration or examination—of the landlord's presentation.

The limited nature of this appeal does not afford an appropriate occasion for an extended discourse on several other possible constitutional infirmities which may attach to the statute. I am not unmindful that apart from *8200 Realty Corp. v Lindsay (supra)*, in *Plaza Mgt. Co. v City Rent Agency* (25 NY2d 630) and *Matter of Hartley Holding Corp. v Gabel* (13 NY2d 306) previous rent control laws were held constitutional. At the risk of bordering on judicial presumption, I venture that the Court of Appeals might welcome an opportunity to reconsider *8200 Realty Corp. v Lindsay.* In *8200 Realty Corp.,* Judge BURKE, the sole dissenter, would have affirmed the First Department's *Per Curiam* opinion (34 AD2d 79), holding the statute unconstitutional. Judge BURKE also solely dissented in *Plaza Mgt. Co.* In *Matter of Hartley Holding Corp.,* it was Judge VAN VOORHIS who dissented. It may well be that these dissenters could prove to be in the tradition of the great Justices HOLMES and BRANDEIS, many of whose dissents ultimately became the law of the land.

I find no references in the several briefs—or for that matter in *8200 Realty Corp. v Lindsay* or in *Bedford Bldg. Co. v Beame* (38 NY2d 729, remittitur amd 39 NY2d 744)—that *Schechter Poultry Corp. v United States* (295 US 495) (the famous "sick chicken" case) or *Carter v Carter Coal Co.* (298 US 238), which, respectively, demolished the National Industrial Recovery Act and the Bituminous Coal Code, are no longer applicable and that there are now no constitutional restraints against granting sovereign, quasi-sovereign, legislative or judicial powers to trade associations.

Of course, granting constitutionality—for, indeed, we must —I see nether conflict nor derogation of the statute's validity in according tenants the right to a reasonable and meaningful examination and questioning of a landlord's supporting data.

In sum, it suffices for our immediate purposes simply to hold, as did Special Term, that elementary concepts of due process, apart from basic judicial proprieties, compel allowing the tenants a fair opportunity to inquire into and question the landlord's documentation. I decline to take judicial notice that

an accountant—even a C.P.A.—in the service and pay of a litigant is so sacrosanct that his methodology or calculations are invulnerable. Surely an application involving some 1,828 units in some 20 buildings and in which the landlord has been granted a 6.31% increase—6% retroactive to April 27, 1975 and a .31% increase retroactive to April 27, 1976—yielding an annual increase of approximately $305,000, merits more than the cavalier treatment apparently accorded by the CAB.

I fail to see the purposes served by the majority's specific overruling of Special Term's holding that the tenants have vested property rights. The very rationale of the statute permitting increases in rent, of necessity, is based upon the landlord having vested property rights, to wit: the right to a fair and reasonable return on his invested capital. Concomitantly and correspondingly, and whether vested or otherwise, a tenant should be entitled to a fair hearing and with no less scrupulous adherence to fundamental precepts of due process as are accorded to person on public assistance whose benefits are sought to be terminated or lessened (cf. *Goldberg v Kelly*, 397 US 254).

The appellants' quibble—a harsh, but justified characterization—is that the CAB "reviews" but does not and need not "audit". Apart from noting that "a rose by any other name" etc., no matter the nomenclature, the conceded realty is that there has been no real inquiry by the CAB. On the contrary, it appears to assume the role of Cerberus vis-à-vis mere tenants.

A further aspect of the rather peculiar approach taken by the CAB is the manner in which the tenants were given an opportunity to protest the landlord's financial allegations. It is patently absurd to allow tenants 10 days within which to question the figures involving this vast number of apartments and what must, unquestionably, be a rather complex bookkeeping arrangement.

I disagree only with that portion of Special Term's opinion which commends that this court promulgate appropriate rules and regulations. If the CAB is, indeed, a real administrative agency, it must promulgate such rules at its own initiative. Apparently it has yet to do so.

Citing *Wasservogel v Meyerowitz* (300 NY 125), appellants repeatedly stress that the tenants have neither constitutional nor "vested property rights" in a controlled apartment. The phrase must be considered in the context of that opinion.

*Wasservogel* involved solely a question of retroactivity of a rent increase. The manner in which it ultimately came to the Court of Appeals is not without interest, for it was initiated as a summary proceeding for the tenants' eviction for nonpayment of rent. That belabored expression is dictum, for the Court of Appeals expressly held that it really had no jurisdiction of the matter by virtue of the supremacy clause of the United States Constitution. Decided in 1949, the whole area of rent control then was one of Federal cognizance; not that of any State. In explaining why it considered the substance of the appeal, the court in *Wasservogel* stated (p 133); "However, so that or views now may be available as to all the questions variously answered in the opinion below, we are expressing those views, even though we conclude, as we do, that the Municipal Court, when shown the Federal Expediter's determination, was bound to accept and act upon it, and could not review or overrule it for supposed invalidity. In *Matter of Schmoll, Inc. v Federal Reserve Bank* (286 N. Y. 503, 509) we said that no State Court may 'control the manner in which a federal agency performs or attempts to perform its functions and duties under the Tariff Act or other federal statute where the Federal government has exclusive jurisdiction.' The attempt by the State courts, in the cases before us, to hold invalid this Federal administrative order, is nothing less than an assertion of control of the manner in which the Federal rent office performed the function assigned to it by Congress."

Prior thereto, *Wasservogel,* in holding that there was no "property right or estate in the premises", stated (p 132): "A statutory tenant holds over not because he has any property right or estate in the premises, but because emergency laws forbid his eviction. Fixation of the maximum amount to be paid by him as rent during such emergency occupation is not a judicial but a legislative act, the actual computation thereof being validly delegated by Congress to an administrative agency *(Bowles v Willingham,* 321 U. S. 503, 512) * * * It may be that, as to a landlord forced to keep a tenant, due process requires that he have a court review of any claim he may make that a reduction of rent, or refusal to allow an increase, is confiscatory (see *Yakus v United States,* 321 U. S. 414, 431 *et seq.; Bowles v Willingham supra,* pp. 519-521)."

Note should be given to that function being "validly delegated" for it presupposes a valid delegation to a true administrative agency. It is well to recall that *Wasservogel* was

decided in 1949, and all that was involved was the retroactivity and not the validity of the increase per se. Thus, it is clear, that the denial of any "property right", in the context of *Wasservogel,* is a dictum. Subsequently, in *Matter of Clason Mgt. Co. v Altman* (34 NY2d 643), there was, inferentially, an attenuation of the dictum for the issue there involved the assignability of a ground lease by a statutory tenant. In remanding to the rent commissioner for a hearing so that the facts could be developed surrounding the month-to-month oral agreement, there was an implicit holding that a tenant had some property rights, for assignability of a lease is a necessary attribute of a leasehold estate.

The statute provides for virtual self-regulation by the industry, and without any real intervention or supervision by an effective, functioning and adequately staffed independent governmental agency. Indeed, and despite the tripartite facade of the CAB, the industry appears to be acting as both Judge and jury. One recalls the venerable maxim of Pascal: "No one should be Judge in his own cause." Phrased less elegantly, in the vernacular, it is akin to having the fox guard the henhouse.

HOPKINS, J. P., and SUOZZI, J., concur with SHAPIRO, J.; HAWKINS, J., concurs in the result, with an opinion.

Judgment of the Supreme Court, Queens County, dated December 14, 1976, affirmed, without costs or disbursements, and with a direction that the escrow agreement with regard to rent increases be continued as to future rents pending the final determination of the issues in this proceeding.