OPINION OF THE COURT
Bentley Kassal, J.
ISSUE
The issue raised by these two article 78 proceedings is whether the expulsion of a former landlord from the Rent Stabilization Association (RSA) for nonpayment of membership fees should bar the readmission of the new landlord, who has no notice of such default and has been attempting to restore the buildings which had been virtually abandoned by their former owners.
FACTS
The two buildings involved in these proceedings are located in rapidly deteriorating and changing neighborhoods of The Bronx where formerly sound and well-maintained dwellings have been permitted to fall into serious disrepair and are now being abandoned by their owners at an alarming rate.
premises: 1085 nelson avenue
This building is a prewar six-story elevator building, with 48 apartments, some of which, upon being vacated, were and became subject to the Rent Stabilization Law of 1969 by operation of the Emergency Tenant Protection Act of 1974. In September, 1975, the petitioner purchased the first mortgage on the property and, in October, 1975, instituted a foreclosure action based upon defaults in mortgage payments exceeding $100,000.
In March, 1977, while the foreclosure proceeding was pend *218 ing (which apparently is still pending), the petitioner, as mortgagee in possession, appointed Joseph Bodak as his agent to manage the property. At that time, the property was in a very bad condition and had been the subject of continuing rent strikes by the tenants. Mr. Bodak, in co-operation with the tenants, undertook a program to restore the building to its former state as a decent and habitable dwelling and it is undisputed that his efforts resulted in the rehabilitation of the building and the restoration of services to the tenants.
Prior thereto, on February 15 and February 25, 1977, letters were sent by RSA to the managing agent of the former landlord warning that, unless dues were paid, the building would be expelled from the RSA. Both warning letters were returned as undeliverable by the postal service. Thereafter, on March 22, 1977, an expulsion order was sent to the same former managing agent.
On December 20, 1977, the petitioner, as mortgagee in possession, wrote to the RSA to re-enroll the building. An application for reinstatement with a copy of the relevant regulations were sent to the petitioner who filed the application, together with requisite dues, reinstatement fee and supporting papers on January 23, 1978.
premises: 1860 grand concourse
This building is a modern seven-story elevator building, with 53 apartments, which was never subject to rent control but was governed by the Rent Stabilization Law of 1969. In September, 1975, the former second mortgagee instituted a foreclosure action, based upon substantial arrears. In that proceeding, the receiver designated Joseph Bodak as managing agent of the premises. In April, 1976, the referee in the foreclosure action conveyed the premises to the second mortgagee who, in turn, conveyed it to the petitioner, a corporation of which Mr. Bodak is president.
Similarly, this building was in a very deteriorated condition at the time Mr. Bodak assumed its management. The roof and walls leaked, the elevator and incinerator were inoperative, oil was not being delivered to the building, the superintendent had quit and no repairs were being made or other services provided to the tenants. One third of the apartments were vacant, the building had been the subject of rent strikes and was on the verge of abandonment. Again, it is undisputed that, after considerable effort, Mr. Bodak returned the build *219 ing to a truly habitable condition and made all real estate tax payments current.
In this case, RSA’s notices of default and expulsion, the latter dated March 10, 1977, were all sent to the former managing agent of the prior landlord and not forwarded to the petitioner. Finally, on December 21, 1977, the petitioner filed an application with the RSA for reinstatement, together with the appropriate fees and other supporting papers. He specifically claimed that he had never received any of the notices sent by RSA and his neglect to contact the RSA sooner resulted from a preoccupation with rehabilitating the building and saving it from foreclosure or abandonment.
REJECTION OF APPLICATION FOR REINSTATEMENT
Both applications submitted to the RSA were, as required, referred to the New York City Department of Housing Preservation and Development (HPD) for review and approval and, after review, were rejected as untimely, resulting in the automatic subjection of the buildings to the provisions of the standard city rent control system. (Administrative Code of City of New York, § YY51-4.0.)
STATUTE AND REGULATIONS
The rent stabilization system, now in effect in the City of New York, was established by the Rent Stabilization Law of 1969 (Local Laws, 1969, No. 16 of City of New York). (Administrative Code, ch 51, tit 44; 8200 Realty Corp. v Lindsay, 27 NY2d 124, app dsmd 400 US 962.)
Pursuant to that law, a real estate industry association (now RSA) was formed to administer the law and adopt a code of operations, subject to approval of the Housing and Development Administration (now (HPD). (Administrative Code, § YY51-6.0, subd c.) The code adopted, the Code of Rent Stabilization Association of New York City provides:
"Section 12. Reopening of membership
"(a) The Industry Association may determine that the failure of an owner of * * * units subject to the Rent Stabilization Law to join the Association within the prescribed time limit was the result of such circumstances, not involving any fault on the part of the owner, as would make it inconsistent with the purposes of the Rent Stabilization Law to place the affected dwelling units under rent control. An application for *220 such a determination shall set forth the grounds for the failure to join the Association and shall be accompanied by a statement by the applicant certifying that he has sent to the tenant of each dwelling unit affected thereby a copy of the application and a notice that the tenant may submit a response thereto to the Association * * * Notwithstanding anything to the contrary contained herein, no application for late membership shall be accepted * * * after May 14, 1971 without the approval of the Housing and Development Administration unless the application is made by a new owner of a registered building purchased from an owner in good standing in the Association.”
The Housing and Development Administration (now HPD) pursuant to subdivision c of section YY51-4.0 of the Administrative Code thereafter promulgated its own regulations (Rent Stabilization Regulations, § 5) to govern such applications for reinstatement which provided in section 5 (subd b, par 2): "(2) An association shall have the sole power, subject to obtaining the specific prior written approval of the Housing and Development Administration, to grant reinstatement to any former member who has been expelled for non-payment of dues whether by order of the Conciliation and Appeals Board or by action of the association. Such approval shall be conditioned upon satisfactory submission by an association of all information required by the Housing and Development Administration in determining whether to grant such approval.”
This provision was promulgated "to provide external control over the reinstatement of previously expelled members, [by requiring] the specific written approval of the Housing and Development Administration”. (The City Record, June 18, 1975.)
These broad guidelines were superseded by an amendment to section 5, promulgated on January 11, 1977, which provided in relevant part:
"c. An association shall have the sole power, subject to obtaining the specific prior written approval of the Housing and Development Administration, to grant reinstatement to any former member who has been expelled for non-payment of dues * * * provided * * * that the re-enrollment application meets the following criteria:
"(1) The applicant demonstrates and establishes that one of the following factual circumstances exists: * * *
*221 "(b) The owner or agent of the property, through no fault of his own, was not properly served with written notice of the arrearage of dues or the consequences of failure to pay such dues as required by the provisions of this section applicable at the time of the expulsion;
"(c) The applicant has been charged by a court with the responsibility of the management and maintenance of such property as an administrator, executor, trustee, referee, or any other similar capacity;
"(d) The applicant acquired title through a foreclosure sale or by deed in lieu of foreclosure, with the result that there had been an actual and permanent transfer of title for value at arm’s length, which was based upon an arm’s length mortgage for value, and provided that no individual or entity having an ownership interest in the property during the period dues were in arrears or at the time of expulsion currently has any ownership interest in the property; * * *
"(2) Timely application is made to be readmitted during the following periods:
"Such application is made not more than six (6) months after the date the property was expelled from an association and, if pursuant to subsections c (1) (c) through (g), within 30 days of the taking of possession or title by the applicant; or,
"(b) Such application is made within sixty (60) days of the effective date of this section”.
The purpose of these amendments was stated as follows:
"This amendment modifies already existing regulations regarding * * * readmission to members who were expelled for failure to pay dues.
"Experience has indicated that there are a number of speciñc situations in which there are compelling equitable reasons to grant requests for approval of readmission. This amendment carefully defines those situations and the time and manner in which such applications for readmission may be made.” (The City Record, Jan. 17, 1977; emphasis added.)
Thus it is clear that, under the 1977 amendment, the applications for reinstatement were untimely since they were made beyond the 30-day period after title was acquired and the six-month period after the date of expulsion (although in neither case was the application filed more than 10 months after expulsion).
*222 STANDARDS FOR REVIEW OF ADMINISTRATIVE REGULATIONS
Administrative agencies have broad authority to adopt regulations in furtherance of their legislative mandate and the courts will not lightly interfere with the promulgation or interpretation of such regulations. As stated by the Court of Appeals in Matter of Mounting & Finishing Co. v McGoldrick (294 NY 104, 108): "Of course, statutory construction is the function of the courts 'but where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court’s function is limited’ (Board v. Hearst Publications, 322 U.S. 111, 131). The administrative determination is to be accepted by the courts 'if it has "warrant in the record” and a reasonable basis in law’ (same citation.) 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body’ ”.
However, the regulation itself must have a reasonable relationship with the objective sought to be achieved and the interpretation of the regulation must have a rational basis in law and fact. (Matter of Colton v Berman, 21 NY2d 322.)
EQUITIES
Viewing the time restrictions imposed by section 5 of the Rent Stabilization Regulations in the abstract, there appears to be a rational basis for establishing and enforcing a uniform deadline for applications for reinstatement. However, the rules cannot be absolute and must be read in light of their intended purpose and other regulations governing such applications.
As emphasized above, the intended purpose of section 5 is to set guidelines recognizing that "there are compelling equitable reasons to grant requests for * * * readmission.” (The City Record, Jan. 17, 1977.)
The equities here appear to be clear. In both cases the , petitioner has taken two very deteriorated buildings on the verge of abandonment and, through enormous time, effort and expense restored them to a viable habitable condition .and current in their real estate tax payments to the city.
The court cannot ignore the fact that, on a daily and dismaying basis, stories appear in the press indicating the great difficulty encountered by the city, itself, in managing *223 such properties when they are taken over in tax foreclosure proceedings. (New York Times, April 10, 1979, p Al, col 6; April 11, 1979, p B4, col 1; April 12, 1979, p B1, col 6; April 16, 1979, p B4, col 4; p A21, col 1.)
Thus, to deny the relief requested here would potentially prejudice the city by encouraging further abandonment, increasing the workload of the already overburdened, underfinanced and, unfortunately, unsuccessful city agencies responsible for such properties.
Section 5 of the Rent Stabilization Regulations must be read together with section 12 of the Code of Rent Stabilization Association, which was approved by the same city agency. That section permits the determination that "the failure of an owner * * * to join the Association within the prescribed time limit was the result of such circumstances, not involving any fault on the part of the owner, as would make it inconsistent with the purposes of the Rent Stabilization Law to place the affected dwelling units under rent control.” The city’s argument that the petitioner has not demonstrated any prejudice if the buildings are expelled from the Rent Stabilization system and placed under standard rent control is not compelling in view of the clear recognition of the differences between the two systems as carefully discussed by the Court of Appeals in 8200 Realty Corp. v Lindsay (27 NY2d 124, supra), and the above statement from section 12 of the Rent Stabilization Code. (See, also, Lincoln Plaza Assoc. v Barbarisi, 60 Misc 2d 905, 906.)
VIEWS OF NEIGHBORHOOD GROUPS AND THE TENANTS
Section 12 of the Code of Rent Stabilization Association also requires that a copy of the request for relief from the time limit be sent to each tenant affected. The clear intent of that provision is to permit the tenants to voice any opposition and demonstrate any prejudice. Here the tenants were notified and did not oppose the application. On the contrary, the HPD file contains several letters from two community organizations in support of the application. Statements in two of those letters from the South Fordham Organization are persuasive and bear quotation:
"The South Fordham Organization has worked with over 105 tenant associations in the Northwest Bronx in the last 4 years. * * *
*224 "It is rare that we have found landlords who are willing to not only work with the tenants in their buildings but also to invest substantially in the upkeep of their properties. Mr. Joseph Bodak has not only upgraded his buildings in the neighborhoods to the extent that they are well known to most everybody, but Mr. Bodak has also helped us with various neighborhood needs which do not directly affect him.
"Joseph Bodak has worked with our organization in approaching the banks in the Bronx concerning mortgage money to upgrade his buildings and in many cases he has been able to secure such mortgages.
"We have come to know and respect Mr. Bodak as one who is sincerely concerned about the future of our neighborhood. For your information, 1860 Grand Concourse and 1085 Nelson Avenue are buildings that were in serious trouble until Mr. Bodak and the tenant associations worked together for their improvement. These two buildings were owned by landlords who were only seeking to milk the properties. Fortunately, Mr. Bodak was able to purchase both properties and, along with the tenant associations, he was able to make both of these properties excellent places to live. * * *
"Recently, it has come to our attention that Mr. Bodak has been denied receiving a Rent Stabilization number. It is unfortunate that the decent landlords are denied the opportunity of having this Rent Stabilization number thus forcing rents down to lower standards. It is difficult to find good owners who are willing to invest in the rehabilitation of their buildings. Inconsiderate action on the part of HPD will only discourage decent owners from investing in our neighborhoods.”
Finally, it should be noted that under the Rent Stabilization Law the Rent Stabilization Association was intended to "play a part closely interrelated with official agencies in rent control by mechanisms designed to protect both owners and tenants”. (8200 Realty Corp. v Lindsay, supra, p 131.) While the Rent Stabilization Association could not permit the petitioner to be reinstated without approval of the HPD, they did write to that agency the following letter with regard to these applications, which, at the very minimum, implies a sympathetic position:
"I am enclosing (2) two applications for which I would request that you give special consideration and forward your opinion.
"The Association is aware that none of the established *225 criteria conform with these buildings, however, the owner and agent have turned them into viable housing in areas that are currently blighted, and have enlisted the support of the community in their endeavors.
"Your opinion and advice would be greatly appreciated.” (Emphasis added.)
CONCLUSION
The nature of the judicial process is one that necessitates flexibility when presented with compelling instances calling for the application of equity and justice. In this case, on one hand, the City of New York, operating through its administrative agency, hinges its position upon the need to have consistency so that its determinations may be relied upon without significant variation, especially in the area of interpretation of its own regulations. (The critical consideration, as stated in the respondent’s memorandum of law, appears to be the "interest of uniform and equitable administration of such approvals or disapprovals”.)
Opposing this unbending desire by the city for consistency are several equally important considerations — this area of the city in which the properties are located, like numerous other areas, unfortunately, has an appalling history of rapidly decreasing housing inventory; those willing to invest in these sectors by way of capital or labor are few in number and are to be encouraged, rather than discouraged by unreasonable roadblocks; the RSA does not seriously object to this application; the responsible neighborhood groups applaud the job being done by this managing agent on these buildings; and, finally, and very significantly, the tenants, after being notified, do not oppose this request.
Further, this court cannot ignore the incontrovertible fact that all levels of government, Federal, State and City, are pouring hundreds of millions of dollars into this and similar areas with distressingly little return or value. This landlord is doing better than the public sector in furthering the public good and should not be unreasonably discouraged.
In summation, in my opinion, we have, on one hand, simply technical objections by the HPD matched up against very "compelling equitable reasons”, highlighted in the regulations as the basis for readmission. In this context, considering the reality of what is occurring in the City of New York in *226 residential housing, outside of minimal areas in Manhattan, Riverdale and a very few other sectors, the logical choice is inescapable.
Under all of these circumstances, I find that interpretation of the regulations by the respondent, Department of Housing Preservation and Development to deny reinstatement of these buildings to the Rent Stabilization system would result in unnecessary and unreasonable prejudice to the interests of the landlord, the tenants and the city, itself. The determination, by failing to properly take into account the purposes of the Rent Stabilization Law, the input of the tenants and the Rent Stabilization Association, the individual circumstances of the case and the excusable neglect by the landlord, was arbitrary and unreasonable and, further, unnecessarily operates as a penalty.
Accordingly, the determination is vacated and the matter remanded to the respondent, Department of Housing Preservation and Development, for further proceedings consistent herewith.