THE PEOPLE OF THE STATE OF NEW YORK ex rel. OFFICE OF RENT ADMINISTRATION, DIVISION OF HOUSING AND COMMUNITY RENEWAL, Respondent, v BERRY ESTATES, INC., et al., Appellants. (Action No. 1.)

BERRY ESTATES, INC., et al., Appellants, v VICTOR MARRERO, as Commissioner of the State of New York Division of Housing and Community Renewal, et al., Respondents. (Action No. 2.)

Second Department, June 1, 1982

162

APPEARANCES OF COUNSEL

*Donald Tirschwell* for appellants.

*Joseph B. Goldman* (*Charles S. Brownstein* and *Martin A. Shlufman* of counsel), for respondents.

*Robert Abrams, Attorney-General* (*Daniel M. Cohen* of counsel), in his statutory capacity under section 71 of the Executive Law.

#### OPINION OF THE COURT

RUBIN, J.

#### I. FACTS

By chapter 576 of the Laws of 1974, the State Legislature enacted the Emergency Tenant Protection Act of 1974 (the ETPA) effective May 29, 1974, finding and declaring that a serious public emergency continued to exist in housing accommodations. The New York State Division of Housing and Community Renewal (the Division) was designated administrator of the ETPA for the Counties of Rockland, Nassau and Westchester (ETPA, § 8, subd a; § 14, subd b). The Division promulgated the Emergency Tenant Protection Regulations (the Regulations) (9 NYCRR Part 2500), likewise effective May 29, 1974, to implement the provisions of the ETPA for housing outside the City of New York.

In general, the ETPA provides that when a city, town or village determines the existence of an emergency requiring the regulation of residential rents for all or separate classes of housing accommodations, any such class of housing accommodations may be subject to the provisions of the ETPA if a declaration of emergency is made by the local legislative body (ETPA, § 3, subd a). Subdivision a of section 3 provides that a declaration of emergency may be made as to any class of housing accommodations if the vacancy rate in that class is not in excess of 5%; and, in addition, a declaration of emergency may be made as to all housing accommodations within the municipality if the vacancy rate is likewise not in excess of 5%. After an emergency is declared, an owner is prohibited from charging or collecting any rent in excess of the initial legal regulated rent (ILRR) or the adjusted initial legal regulated rent, until a different legal rent has been authorized pursuant to the guidelines adopted by the local Rent Guidelines Board (ETPA, §§ 4, 6, subd a). The local effective date (LED) for such rent control is the first day of the month or other rental period following the declaration of

the emergency. The ILRR, pursuant to said LED, then becomes the rent reserved in the last effective lease or other rental agreement immediately preceding the LED, unless the Division grants an adjustment upon timely application by the landlord or tenant. By virtue of these provisions of the ETPA, a rent freeze is instituted in the municipality.

The Village of Spring Valley (the Village) adopted, at different times, four resolutions, each declaring a housing emergency to exist with respect to different classes of housing accommodations within the Village. Resolutions Nos. 1 and 3[1] were never challenged[2] and are not involved in this appeal.

Resolution No. 2, adopted September 30, 1974, declared, after a public hearing and a finding of a vacancy rate lower than 5%, a housing emergency requiring the regulation of residential rents in all housing accommodations not previously regulated under Resolution No. 1 (June 27, 1974), "except those accommodations in structures which have not completed all planned construction of all rental accommodations prior to September 1, 1974".

Thereafter the Division commenced an action to enjoin certain landlords from violating the ETPA invoked by Resolution No. 2. A defendant landlord therein, named Mack, not one of the appellants before us, challenged Resolution No. 2 as invalid alleging that the vacancy rate for the subject housing accommodations in the Village at the time of its adoption was in fact greater than 5%.

The court (KELLY, J.) on November 30, 1976, declared Resolution No. 2 valid, and granted a preliminary injunction to the Division (*People ex rel. Office of Rent Administrator, Div. of Housing & Community Renewal v Mack*, 88 Misc 2d 1027). However, after the defendant landlords therein, by motion dated December 13, 1976, moved to "amend and modify" that decision on the ground of newly discovered evidence, the court granted renewal, denied the motion for a preliminary injunction, and declared Resolution No. 2 invalid. The court determined that 114 new

---

1. The respective resolutions are numerically designated for the purpose of convenient reference.

2. Resolutions Nos. 1 and 3 were also not challenged in the prior *Mack* appeal hereinafter discussed.

residential housing units in the Village, for which certificates of occupancy had been issued, should have been included in the vacancy rate computation and, as a consequence, such inclusion raised the vacancy rate for such units in excess of 5%; and, therefore, the declaration of an emergency under the ETPA had been improperly made.

The Village, also a plaintiff in the *Mack* action, appealed to this court and, pursuant to CPLR 5519 (subd [a], par 1), obtained an automatic stay of Justice KELLY's order. The effect thereof was to maintain the validity of Resolution No. 2, and the rent freeze as of October 1, 1974, the LED thereunder, pending resolution of that appeal. On October 23, 1978, this court affirmed without opinion the order appealed from (65 AD2d 681). The Village then continued the statutory stay by timely moving in this court for leave to appeal to the Court of Appeals. On November 28, 1978, we denied the motion. The Village finally moved in the Court of Appeals for leave to appeal; that court dismissed the motion on May 8, 1979 (47 NY2d 706, 800) and thus any right to further automatic statutory stays pursuant to CPLR 5519 was terminated. These stays had the effect of keeping the housing emergency, and the rent freeze thereunder, alive into May of 1979.

Meanwhile the Village, on December 5, 1978, enacted Resolution No. 4, which the landlord appellants (hereafter the landlords) claim to be a "backstop" resolution. In it, the Village again found, after a new public hearing, that the vacancy rate was lower than 5%, and determined, in pertinent part, "that a public emergency continues to exist in all residential housing accommodations set forth in the Village Board resolutions * * * of September 30, 1974" (i.e., Resolution No. 2).

In accordance with section 6 of the ETPA, January 1, 1979, was the LED of Resolution No. 4, it being the first day of the month following the December 5, 1978 declaration of a housing emergency; and, the "initial legal regulated rent" thereunder was the rent in effect in the Village immediately preceding that date. Since Resolution No. 2 was enacted September 30, 1974, the Village rent freeze thereunder became effective on October 1, 1974. Therefore, by virtue of the automatic statutory stays in the *Mack*

appeal, that rent freeze date was continued in effect as the ILRR upon the adoption of Resolution No. 4.

Against this background, we now turn to the specific events leading to this appeal. The Division learned that the landlords, beginning in October, 1978, were demanding rents and security deposits in excess of those fixed pursuant to Resolution No. 2, despite the rents frozen by the statutory stays and continued in effect by Resolution No. 4.

As a consequence, on March 14, 1979 the Division notified all owners of rental housing units in the Village that, pursuant to Resolution No. 4, "all rented housing accommodations in the Village of Spring Valley with the exception of the housing accommodations expressly excluded continue to be and are presently subject to the ETPA." The landlords commenced a proceeding pursuant to CPLR article 78 to review this March 14, 1979 notice (Action No. 2). The Division then commenced an action to enjoin these landlords from violating the ETPA (Action No. 1). The Supreme Court (*Matter of Berry Estates v Marrero*, 101 Misc 2d 297 [ZECK, J.]), dismissed the petition in Action No. 2 because the Division's letter of March 14, 1979 was not a "final determination" as required by CPLR 7801. The court also declined to convert the proceeding into an action for a declaratory judgment, holding that the petition did not squarely present any constitutional issues, which, if they existed, could be pleaded as affirmative defenses in opposition to a permanent injunction. However, the court granted a temporary injunction in Action No. 1 and denied the landlords' motion to dismiss that action, stating (101 Misc 2d, at p 301):

"This court does not applaud the use of a judicial stay by the Village as a tactic to enforce compliance with an illegal enactment. This has placed the landlords under *de facto* rent control since 1976, while no proper emergency resolution was adopted until December 5, 1978.

"Although recognizing the inequity of holding a landlord to the constraints of rent control under an illegal municipal resolution while the judicial decision proceeds through the appellate process, nevertheless, the landlord is required to be in compliance with the act, and the statute

authorizes its enforcement by the injunctive process (ETPA, § 12, subd a, par [3]). Therefore, this court has no alternative but to grant a temporary injunction."

The landlords appealed to this court from both the judgment dismissing their article 78 petition and from the order granting the temporary injunction to the Village and denying their motion to dismiss. We reverse the judgment dismissing the petition in the article 78 proceeding, and converted the proceeding into a declaratory judgment action (Action No. 2). We also modified the order denying the landlords' motion to dismiss the injunction action (Action No. 1) and granted the Division's motion for a temporary injunction by directing the landlords to deposit with the Clerk of the Supreme Court, Rockland County, any rents collected in excess of the applicable legal regulated rents, to be held in escrow for return to the party prevailing in the permanent injunction action (74 AD2d 871).

These actions then proceeded to trial before Justice KELLY without a jury. The first witness for the Division was Alan Haimowitz, who had moved into the landlords' apartment complex in June, 1977 under a two-year lease setting his monthly rental at $290. Shortly before the end of the lease period, the landlords sent Mr. Haimowitz an offer to renew his lease. Using the Division's prescribed form for rent renewal offers, the landlords altered the column headed "Present Legal Regulated Rent", to read "Present Rent", and inserted the amount of $335. A sheet attached thereto by the landlords, referring to the *Mack* case, stated: "Due to the Court's decision, rendering the Tenants Protection Act invalid in the Village of Spring Valley from 1974/78 'present legal-regulated rent' is herein taken to mean the present [i.e., market] rental of a one, two, or three bedroom apartment as described below." The amount inserted was the landlords' opinion of what that rent should have been. Mr. Haimowitz signed a new three-year lease at a monthly rental of $378.85. Another tenant, Allyne Martens, testified to a similar course of dealing by the landlords, and the parties stipulated that the Division could have produced 15 other witnesses whose testimony would have been substantially similar to that of Mr. Haimowitz.

The landlords called as witnesses several of their officers. Two, Ruben Josephs and Elias M. Josephs, established that the Division, in an order and determination dated June 22, 1978, finding them guilty of overcharging one Michael Freitas in an unrelated rent complaint, had itself expressed some doubt about the continuing applicability of the ETPA pending the determination of the *Mack* appeal. This doubt was indicated by attaching to its order a "Notice" which read: "The enforcement of this Order and Determination may be affected by the final disposition of the pending appeal by the Village of Spring Valley in the case of 'The People of the State of New York, Ex Rel Office of Rent Administration, Division of Housing and Community Renewal, Plaintiff, and the Village of Spring Valley, Plaintiff-Intervenor against Nat Mack * * * Defendants.'"

They also established that the "present" rent of $335, listed in the renewal notice sent to Haimowitz, reflected the fair market rent for his apartment on the renewal date.

They further testified that the landlords had received no notice from the Village of its adoption of Resolution No. 4 on December 5, 1978. The first notice thereof was the Division's letter dated March 14, 1979. However, no officer of the landlords had ever requested a copy of the resolution from the Village Clerk-Treasurer. A third officer, Howard Josephs, stated that the landlords learned of the passage of Resolution No. 4 in response to his telephone inquiry in February, 1979, to the Village Attorney. She had advised him that "the original rent guidelines were still in effect, but that they had adopted another resolution." As a consequence, Josephs then obtained a copy of the resolution within 60 days of its adoption. (This is the time period in which an owner may apply for adjustment of the ILRR under subdivision a of section 9 of the ETPA.)

The landlords also called as their witness Robert Herman, the State Rent Administrator, who was fully cognizant of the circumstances attending the *Mack* litigation. While the Village's appeal therein was pending, and the statutory stay was in effect, the Division carried out what Mr. Herman viewed as its responsibility to administer the ETPA pursuant to the Village Board's declaration of an

emergency. After learning that the Village was filing a notice of appeal in the *Mack* case, the Division urged the Village Attorney to seek speedy review and resolution of the matter, while the Division continued to enforce the ETPA.

On December 5, 1978, the date Resolution No. 4 was passed, the Division possessed a current list, furnished by the Village, of all owners of apartment units. However, the Division did not notify the landlords herein of the passage of Resolution No. 4 until it sent its letter notice of March 14, 1979.

By said letter, the Division notified all owners of covered housing units of the respective emergency resolutions enacted by the Village, and that although Resolution No. 2 had been declared invalid, the determination had been stayed by the pending appeals. The owners were further advised that even if the invalidity of that resolution were affirmed, Resolution No. 4, enacted December 5, 1978, continued all housing units subject to the ETPA; and, that "the legal regulated rent for each such unit commencing January 1, 1979 was the rent in effect under the last lease, normally the rent collected on December 1, 1978."

The only landlords actually notified by the Division of the enactment of Resolution No. 4, prior to its mailing of said letter notice, were those involved in administrative actions initiated by tenants' complaints. However, in Administrator Herman's opinion, the Village had invoked the ETPA as early as 1974, thus giving constructive notice to all affected landlords and tenants. The Division's continuing enforcement activities, therefore, were based on his position that the ETPA remained in effect in the Village of Spring Valley because of Resolution No. 2, the effectiveness of which was preserved by virtue of the statutory stays during the appellate process, or, in the alternative, by Resolution No. 4, after it was passed on December 5, 1978. Mr. Herman also maintained that Resolution No. 4 conferred jurisdiction upon the Division to order rent reductions even when tenants had voluntarily signed leases, and the Rent Guidelines Board had promulgated guidelines, before its adoption.

In his written decision, Justice KELLY rejected the land-lords' contention that the Division exceeded its authority in determining, after the passage of Resolution No. 4, that the ILRR would be the rents in effect December 1, 1978, even though those rents were based on the invalidated Resolution No. 2. The court held that said determination was proper because Resolution No. 2 remained in effect pending the appeal to this court by virtue of the statutory stay; and, because the landlords failed to apply for an adjustment of the ILRR within 60 days of the passage of Resolution No. 4, as provided in subdivision a of section 9 of the ETPA, even though they had notice of the passage of Resolution No. 4, and had obtained a copy thereof from the Village Clerk, within the 60-day period.

The court also rejected the landlords' contention that Resolution No. 4 was based on the invalid Resolution No. 2, by finding that it was predicated on an independent survey establishing a vacancy rate of under 5% as required by the ETPA. Further, it found without merit the landlords' con-tention that Resolution No. 4 was a "backstop" to take effect only if Resolution No. 2 was finally determined to be invalid after exhaustion of the respective appeals to this court and the Court of Appeals.

The court determined that no constitutional infirmities existed in section 9 of the ETPA, notwithstanding its lack of provision for service upon affected landlords of the implementation of the ETPA in a municipality, and its different treatment of tenants and landlords.

Addressing the Division's complaint for an injunction, the court held that the landlords had violated the ETPA by altering the Division's renewal notice forms, and substitut-ing market value rent for the ILRR. The court granted the injunction.

## II. CONSTITUTIONALITY OF THE ETPA

The landlords claim the ETPA is unconstitutional for two reasons: (A) lack of due process because it fails to provide for service of notice to affected landlords of the adoption of a local resolution of emergency implementing the regulatory machinery of the ETPA; and (B) unequal protection of the law in that section 9 of the ETPA affords

different remedies to aggrieved tenants than it does to aggrieved landlords.

Initially we observe that a legislative enactment, be it a statute or ordinance, carries with it an exceedingly strong presumption of constitutionality. Every intendment is in favor of the statute's validity so that the very heavy burden of demonstrating unconstitutionality beyond a reasonable doubt rests upon the one who attacks a statute as unconstitutional. Only as a last unavoidable result do courts strike down a legislative enactment as unconstitutional (cf. *Benson Realty Corp. v Beame,* 50 NY2d 994, 995, app dsmd *sub nom. Benson Realty Corp. v Koch,* 449 US 1119; *I.L.F.Y. Co. v Temporary State Housing Rent Comm.,* 10 NY2d 263, 269; *Wiggins v Town of Somers,* 4 NY2d 215, 218; *Lincoln Bldg. Assoc. v Barr,* 1 NY2d 413, 415).

With this premise, we consider the constitutional issues raised by the landlords.

### A. LACK OF DUE PROCESS

■ At the outset, we point out that a law of the case issue arises, although neither party raises it. This same due process contention was presented on the prior appeal herein by the landlords (74 AD2d 871, *supra*), and although our decision does not specifically address this issue, it was considered and decided of necessity. However, to lay this issue to rest, we will set forth our reasoning for concluding that the ETPA does not violate due process.

The substance of the claim is that the ETPA violates due process because it does not require notice to affected landlords of the invocation of the ETPA by a local declaration of emergency so as to make actual notice a reasonable probability. However, notice may be dispensed with without violating due process in emergency situations in which the State acts to further the public welfare (9 NY Jur, Constitutional Law, § 341; *Wasservogel v Meyerowitz,* 300 NY 125; *Bowles v Willingham,* 321 US 503, 519-520).

Subdivision c of section 3 of the ETPA provides, in pertinent part: "No resolution declaring the existence or end of an emergency * * * may be adopted except after public hearing held on *not less than ten* days public notice, as the local legislative body may reasonably provide."

(Emphasis added.) The landlords do not claim the notice of the public hearing which preceded the adoption of Resolution No. 4 was in any way unreasonable or inadequate. Rather, they claim that notice of a public hearing, which is a prerequisite for the declaration of a local housing emergency, is not notice reasonably calculated to apprise landlords of the adoption of a resolution of a local emergency which invokes the ETPA.

This contention is meritless. The ETPA requires a public hearing on no less than 10 days' "public notice" before a housing emergency may be declared. Due process demands reasonable notice but does not exact perfection or certainty. Surely, this notice requirement was reasonably calculated under the circumstances to apprise the landlords herein, as interested parties, of the pendency of the emergency legislation, and to afford them an opportunity to be heard at a public hearing, although it does not appear in the record that they took advantage of it.

In *Bowles v Willingham* (*supra*), it was alleged that the Emergency Price Control Act violated the Fifth Amendment because it made no provision for a hearing, or an opportunity to be heard, to landlords before the order or regulation fixing rents became effective. The Supreme Court, quoting Mr. Justice HOLMES in *Bi-Metallic Co. v Colorado* (239 US 441, 445), stated (321 US, at p 519): "'Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption * * * General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard.'"

Once the landlords were apprised of the public hearing, they were also on notice that the Village Board would act after listening to interested parties and that the result of the action taken would be of vital interest to them. Clearly, they did not have to be provided with the direct result of said hearing, any more than residents who appear at any public hearing on proposed legislation are entitled to have a copy of the legislation mailed to them, or to be personally notified of the outcome.

This due process argument is specifically addressed to Resolution No. 4, adopted December 5, 1978. As Rent Administrator Herman testified, however, the Village had invoked the ETPA as early as July, 1974, thus giving constructive notice to all affected landlords and tenants. The Division's actual notice to landlords of the enactment of Resolution No. 4, by its letter of March 14, 1979, was not statutorily mandated, but was a courtesy extended to apprise all landlords of the continuation of the rent emergency so as to forestall violations of the ETPA. Additionally, one of the landlords' officers, Howard Josephs, testified that he learned of the passage of Resolution No. 4 sometime in February, 1979, in response to a telephone call to the Village Attorney when she further advised him that "the original rent guidelines were still in effect". As a result, Josephs, in behalf of the landlords, then obtained a copy of Resolution No. 4 within 60 days of its adoption.

Finally, the landlords' contention that the trial court's reliance on *Wasservogel v Meyerowitz* (300 NY 125, *supra*) was misplaced, is also without merit. It matters not whether *Wasservogel* allows the disregard of the notice requirement of due process in emergency situations in which the State acts to further the public welfare. The ETPA requires, and the landlords received, as did all interested parties in the Village, reasonable notice of the public hearing and an opportunity to be heard.

The notice provisions of the ETPA do not violate the landlords' due process rights.

### B. UNEQUAL PROTECTION OF THE LAWS

The landlords also claim that the ETPA deprives them of equal protection of the laws because under subdivision a of section 9 of the statute, landlords are treated differently than tenants (§ 9, subds a, b).[3]

---

**3.** Subdivisions a and b of section 9 of the ETPA provide:

"a. The *owner or tenant* of a housing accommodation described in paragraph one or two of subdivision b of section six may, within *sixty days* of the local effective date of this act or the commencement of the first tenancy thereafter, whichever is later, file with the state division of housing and community renewal an application for adjustment of the initial legal regulated rent for such housing accommodation. The state division of housing and community renewal may adjust such initial legal regulated rent upon a finding that the presence of *unique or peculiar circumstances* materially affecting the

This argument ignores the substantive distinction between subdivisions a and b of section 9.[4]

■ Subdivision a of section 9 applies to all apartments subject to the ETPA, including those formerly regulated under the Emergency Housing Rent Control Law (EHRCL)[5] (Regulations, § 21, subds 1, 2; § 22; 9 NYCRR 2501.1 [a] [b], 2501.2). Subdivision a of section 9 allows a landlord *or* tenant of such an apartment to apply to the Division for an adjustment of the ILRR on the ground of "unique or peculiar circumstances materially affecting" the ILRR, resulting in a rent which is "substantially different from the rents generally prevailing in the same area for substantially similar housing accommodations". Such applications must be filed within 60 days of the effective date of the ETPA in the municipality, or the commencement of the first tenancy thereafter, whichever is later. Significantly, under subdivision a of section 9, the ETPA does not provide for notice to a landlord or tenant. Because subdivision a treats both exactly alike providing the same remedy, it in no way deprives landlords of equal protection of the laws.

Subdivision b of section 9, however, applies only to those certain apartments now regulated by the ETPA that were never subject to the EHRCL, or, if subject to it, were

initial legal regulated rent has resulted in a rent which is substantially different from the rents generally prevailing in the same area for substantially similar housing accommodations.

"b. The *tenant* of a housing accommodation described in paragraph two, subdivision b, of section six may file with the state division of housing and community renewal, within *ninety* days after notice has been received pursuant to subdivision c of this section, an application for adjustment of the initial legal regulated rent for such housing accommodation. Such tenant need only allege that such rent is *in excess of the fair market rent* and shall present such facts which, to the best of his information and belief, support such allegation. The rent guidelines board shall promulgate as soon as practicable after its creation guidelines for the determination of *fair market rents for housing accommodations* as to which an application may be made pursuant to this subdivision. In rendering a determination on an application filed pursuant to this subdivision b, the state division of housing and community renewal shall be guided by such guidelines. Where the state division of housing and community renewal has determined that the rent charged is in excess of the fair market rent it shall order a refund, of any excess paid since January first, nineteen hundred seventy-four or the date of the commencement of the tenancy, whichever is later. Such refund shall be made by the landlord in cash or as a credit against future rents over a period not in excess of six months." (Emphasis added.)

4. This distinction was recognized by the First Department in *Matter of Freeport Randall Co. v Herman* (83 AD2d 812).

5. An expressed legislative purpose in enacting the ETPA was to regulate housing rents not subject to the EHRCL (L 1946, ch 274, § 17, as amd), or which were decontrolled thereunder, resulting in excessive and unwarranted rent increases because of the continuing housing shortage (ETPA, § 2).

decontrolled any time before the LED of the ETPA. Subdivision b gives tenants an additional remedy not afforded to either landlords or tenants under subdivision a. Under subdivision d of section 9, the landlord must give a tenant notice by certified mail of the ILRR within 30 days of the effective date of the act, and the tenant then, under subdivision b, has the right within 90 days after receiving said notice, to apply for a downward adjustment of the ILRR on the ground that such rent is in excess of the fair market rent. Since the only relief under subdivision b is on the ground that the ILRR is "in excess of the fair market rent", the basis for such an application excludes landlords.

Although the Legislature thus created a special class of tenants under subdivision b with the right to apply for a downward adjustment of rent within 90 days of the written notice, it does not accord the landlords or tenants under the respective subdivisions a or b unequal treatment. Under subdivision a, the test is comparability of rents because of "unique or peculiar circumstances". This challenge is available to both landlords and tenants. In contrast, subdivision b encompasses those apartments which have remained longest in the free market and, therefore, have approximated or exceeded market level rents. These applications for adjustment are thus determined by the free market guidelines promulgated by the county rent guidelines (cf. *Matter of Freeport Randall Co. v Herman,* 83 AD2d 812).

Legislative exercises of the police power, such as the regulation of rents, which do not affect a fundamental right or interest (*Bowles v Willingham,* 321 US 503, 517-520, *supra; Teeval Co. v Stern,* 301 NY 346, 362), are afforded a low level of judicial scrutiny when challenged on equal protection grounds: "It is enough to sustain the legislative power if the rationality of the classifications is demonstrable" (*8200 Realty Corp. v Lindsay,* 27 NY2d 124, 137). The Legislature could have rationally concluded that the possibility of undue harm resulting from "stabilization" of unfair rents, due to the shortage in housing, was greater for tenants than for landlords, and thus warranted the additional tenants' remedy provided by subdivision b of section 9 of the ETPA.

For the same reason, the landlords' further argument that subdivision d of section 9 deprives them of due process because it requires landlords to notify tenants of their ILRR, lacks merit. Apparently, the Legislature likewise rationally concluded that landlords would be more likely than tenants to know that the ETPA had been activated in a given building, and the burden on the landlords consequently is not onerous. Furthermore, this requirement does not deprive a landlord of due process because if a tenant, after receiving the landlord's notice, should file such application for reduction of the ILRR, then the landlord must be furnished with a copy, and he is given an opportunity to respond thereto and demand a hearing (ETPA, § 9, subd c).

In sum, the different treatment of landlords and tenants is not only negligible under section 9 of the ETPA, but also has an eminently rational basis. As Trial Term correctly concluded: "The legislative finding expressly states that the purpose of the ETPA is to prevent the exaction of unwarranted and excessive rent increases which would result from a shortage in housing. The act, therefore, was clearly adopted for the benefit of the members of the general public who would utilize such housing, and it is understandable that they would be afforded greater protection than the owners of such housing."

Subdivisions a and b of section 9 of the ETPA are constitutional. They do not deny landlords due process because of a lack of notice, nor do they deprive them of equal protection.

### III. LANDLORDS' ALLEGED ENTITLEMENT
#### TO UNUSUAL REMEDIES

The landlords claim Trial Term erred in approving the Division's notice to landlords, dated March 14, 1979. This notice had advised them that rents under Resolution No. 4 were the rents last in effect before the enactment of that resolution, notwithstanding that those rents were fixed under the invalidated Resolution No. 2, and continued by statutory stays in the *Mack* appeal. The landlords take strenuous exception to the Division's continuing enforcement of the ETPA during the pendency of such unsuccess-

ful appeals, contending that deliberate "calculated actions" by the Village in abusing the appellate process, entitle them to "unusual remedies".

■ The "unusual remedy" to which the landlords believe they are entitled is a declaration that the ILRR in effect on their properties on January 1, 1979, be deemed the fair market rents on that date. They contend that *Mayer v City Rent Agency* (46 NY2d 139) is "determinative of the case at bar". The Court of Appeals therein did, indeed, hold that a party may be entitled to "unusual remedies" when his rights are frustrated by "calculated action" of municipal authorities. However, this is not such a case.

*Mayer* involved two New York City rent laws and the State enabling statute. Local Law No. 30 of 1970 established a maximum base rent, provided a formula for increases, and contained a "labor cost pass-along" provision in addition thereto. In March, 1977, the first "labor cost pass-alongs" began to be processed, and while these were pending, the city adopted Local Law No. 76, which provided, in substance, that labor cost was to be included in, and not in addition to, increases allowed by the rent increase formulas, and that any such increases over the formulas had to be refunded to the tenant. Certain landlords then brought a declaratory judgment action to invalidate Local Law No. 76 as being in conflict with the 1971 amendments to the State enabling act (L 1962, ch 21, as amd by L 1971, chs 372, 1012), which prohibited more restrictive housing regulations by local law, unless first approved by the State Division of Housing. Summary judgment was granted declaring Local Law No. 76 invalid. Relevant to this appeal, the landlords therein contended that labor cost pass-alongs thereafter granted, on applications pending on the date of enactment of Local Law No. 76 (October 28, 1977), should be effective retroactively as of that date on which they would have been issued but for the intervention of Local Law No. 76, which was invalidated. The city rent agency by its appeal had obtained a statutory stay, which was continued during the appeals to the Appellate Division and the Court of Appeals, which affirmed as to the invalidity of Local Law No. 76.

The *Mayer* case does not support the landlords' position. There, as here, there had been appeals by government

agencies, ultimately unsuccessful, and the concomitant statutory stays. The Court of Appeals held that such course of appeals did not per se constitute "calculated action" designed to frustrate the landlords' rights, and remitted the matter for further proof on that issue. At bar, the only evidence of alleged "calculated action" is the claimed dilatory action of the Village Attorney in perfecting the appeal to this court from the prior order of Justice KELLY in the *Mack* case (88 Misc 2d 1027, *supra*), wherein Resolution No. 2 was declared invalid, thereby prolonging the statutory stay of that order.

Our examination of the *Mack* appeal indicates that the appeal process was not unduly slow.[6] CPLR 5519 (subd [a], par 1), providing for an automatic statutory stay pending appeal, "expresses a public policy designed to protect a 'political subdivision of the state'" in its conduct (*DeLury v City of New York*, 48 AD2d 405; *Town of Plattekill v Dutchess Sanitation*, 56 AD2d 951; *Byrne v Long Is. State Park Comm.*, 67 Misc 2d 1084).

Nor did the landlords adduce proof that the Village, deliberately or negligently, stalled the progress of the appeal so as to frustrate the legitimate pursuits of the landlords. At most what emerges is a picture of a small, part-time Village Attorney's office attempting to handle some rather involved litigation for which it was not sufficiently staffed.

Indeed, if the Village Attorney was unjustifiably delaying perfection of its appeal to take advantage of the statutory stay, as the landlords allege, they could have applied to intervene as of right in the *Mack* appeal, pursuant to CPLR 1012 (subd [a], par 2), since their interest would be adversely affected by the determination therein. Once parties to the action, the landlords could then have moved either to vacate the statutory stay (see CPLR 5519, subd [c]) or, if the appeal were not perfected within one year of the date of entry of the order, moved to dismiss the appeal

---

**6.** The *order* invalidating Resolution No. 2 was dated July 29, 1977. The judgment thereon was entered August 2, 1977; the Village perfected its appeal for the September, 1978 term of this court; the order was affirmed on October 23, 1978; on November 28, 1978, we denied leave to appeal to the Court of Appeals. Notice of entry of this order was served on the Village on March 22, 1979; and the Village moved the Court of Appeals for leave to appeal on April 13, 1979. The Court of Appeals dismissed the motion on May 8, 1979.

as abandoned, pursuant to former subdivision (f) of section 670.20 of the rules of this court (22 NYCRR 670.20, former [f]). Given the landlords' failure to take steps to hasten the decision of the appeal, they should not be entitled to the unusual remedy they request since no basic unfairness justifies the same.

The cited cases of *Matter of Amsterdam-Manhattan Assoc. v Joy* (42 NY2d 941) and *Matter of Pokoik v Silsdorf* (40 NY2d 769) are factually inapposite; and any delay at bar was not as egregious nor as purposeful as the governmental actions therein.

### IV. RESOLUTION NO. 4 WAS NOT A "BACKSTOP" RESOLUTION

The landlords contend that the trial court erred in not finding that Resolution No. 4 was a "backstop" resolution which was to take effect only if, and when, the validity of Resolution No. 2 was finally determined adversely to the Village. Respondents concede that Resolution No. 4 was so characterized by them, at Special Term, on the preliminary injunction motion (*Matter of Berry Estates v Marrero,* 101 Misc 2d 297, *supra*), but now contend that Resolution No. 4 took effect at the statutorily prescribed period.

By its terms, Resolution No. 4 did not prescribe an effective date. Therefore, its effective date (LED) was that prescribed by subdivision a of section 6 of the ETPA, to wit, "the first day of the first month * * * following a declaration of emergency". Since Resolution No. 4 was enacted December 5, 1978, its LED was January 1, 1979. Notwithstanding respondents' counsel's admission, and Justice ZECK's characterization of Resolution No. 4 as a "backstop" resolution, the same does not constitute the law of the case as the landlords argue. That issue was not considered on the prior appeals herein, and the "law of the case" rule applies only to courts of co-ordinate jurisdiction and not to an appellate court (*Martin v City of Cohoes,* 37 NY2d 162, 165).

Furthermore, even if Resolution No. 4 were deemed effective as of June 1, 1979,[7] the landlords did not apply for

---

7. The LED as the first day of the first month after the Court of Appeals, on May 8, 1979, dismissed the motion for leave to appeal, finally invalidating Resolution No. 2, and thus terminating the statutory stay.

an adjustment of the ILRR within 60 days of that date (ETPA, § 9, subd a). For the same reason, assuming that counsel's admission before Justice ZECK was a "judicial admission", as the landlords argue, this contention is likewise academic because the 60-day period in which they could have applied for such adjustment of rent has long since passed.[8]

In any event, the opinion of the Division's counsel as to the legal effect of Resolution No. 4 is not a fact which is properly the subject of a judicial admission (cf. Richardson, Evidence [Prince, 10th ed], § 226). The LED of such resolutions is fixed by the ETPA (§ 6, subd a). Municipalities may invoke the ETPA to the extent permitted by the act and, thereafter, the Division enforces the ETPA under the promulgated rent guidelines. However, the municipalities which invoke the ETPA cannot vary the statutorily prescribed effective date, nor can the Division.

### V. THE TIME LIMITATION PRESCRIBED BY THE ETPA IS NOT A STATUTE OF LIMITATIONS TO BE AFFIRMATIVELY PLEADED

■ Subdivision a of section 9 of the ETPA provides the exclusive means by which a landlord may file an application for adjustment of the ILRR within 60 days of the effective date (LED) of an emergency resolution. As pointed out above, the landlords failed to file such an application within said period of the LED of Resolution No. 4, i.e., January 1, 1979, or even within 60 days of June 1, 1979 (the LED, if calculated from the dismissal by the Court of Appeals of the motion for leave to appeal). To avoid the consequences of such failure, the landlords contend that the respondents, by failing to plead subdivision a of section 9 as a Statute of Limitations in the answer to Action No. 2, or as a reply to the counterclaim in Action No. 1, pursuant to CPLR 3018 (subd [b]), waived that time limitation.

Subdivision a of section 9 of the ETPA is not a Statute of Limitations for several reasons. CPLR 3018 (subd [b]), insofar as pertinent, requires the defense of Statute of

8. The LED of Resolution No. 4 was January 1, 1979.

Limitations to be affirmatively alleged. However, CPLR article 2, entitled "Limitations of Time", provides in section 201, that the article applies to the commencement of "[a]n action",[9] which an application under subdivision a of section 9 is not.

Additionally, as the trial court, citing *Romano v Romano* (19 NY2d 444), held, there is a distinction between a pure Statute of Limitations and a special statutory limitation. In *Romano* the court held that where an action is purely statutory, the time fixed in the statute must be treated as a qualification annexed to the created right, and not a Statute of Limitations, so that a lapse of the statutory period operates to extinguish the right altogether (see, also, *Matter of Obolensky v New York State Div. of Human Rights,* 67 AD2d 1069).

The entire rent regulation scheme established by the ETPA is statutory. Subdivision a of section 9 creates the sole statutory procedure for landlords seeking an adjustment of the ILRR. The 60-day time limitation prescribed therein is an integral part of the application, in the nature of a condition precedent. Failure to comply therewith extinguishes the right (see *Romano v Romano, supra*), and the time limitation need not be asserted as an affirmative defense (see *Matter of Obolensky v New York State Div. of Human Rights, supra*).

On this appeal, the landlords now further contend that the trial court "misinterpreted" its cause of action, and that the *Obolensky* decision may be distinguished. They argue that they seek a declaration that the March 14, 1979 "determination" by the Division was "an unconstitutional application of an otherwise constitutional statute".

In essence, this is a reargument, with a different label, of the landlords' contention of its entitlement to "unusual remedies" by virtue of the alleged abuse by the Village of statutory stays. The relief sought is identical. This issue having been previously considered, no further comment is necessary.

**9.** The only exception appears to be a "proceeding" against a body or officer (CPLR 217).

Although not specifically urged by the landlords, if it is now claimed that the Division's notice of March 14, 1979 effects an impairment of contract obligations in that the renewal leases executed by them, in contravention of the rents frozen by the stay of Resolution No. 2, will have to be adjusted according to the rent guidelines (ETPA, § 9, subd b), then this contention is equally without merit (cf. *Matter of Freeport Randall Co. v Herman,* 83 AD2d 812, 813, *supra*). Section 9 of the ETPA is constitutional and was constitutionally applied by the Division by its notice to landlords dated March 14, 1979.

Accordingly, the judgment should be affirmed.

TITONE, J. P., GIBBONS and WEINSTEIN, JJ., concur.

Judgment of the Supreme Court, Rockland County, entered July 28, 1981, affirmed, with costs.